T.C. Memo. 1996-519


UNITED STATES TAX COURT


ESTATE OF ROBERT G. KLUENER, DECEASED, DONALD E. HATHAWAY, CO-
EXECUTOR AND CHARLOTTE J. KLUENER, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 3867-95.              Filed November 25, 1996


<u>David E. Hathaway</u>, for petitioners.

<u>Jeffrey L. Bassin</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

WELLS, <u>Judge</u>:  Respondent determined a deficiency of

$284,247 in, and an accuracy-related penalty of $56,093 pursuant

to section 6662(a) on, Robert G. Kluener's[1] and Charlotte J.

---

[1]    Robert G. Kluener died prior to the issuance of the notice
                                        (continued...)

Kluener's 1989 Federal income taxes (Robert G. Kluener and Charlotte J. Kluener are sometimes hereinafter referred to as the Klueners, Robert G. Kluener is referred to individually as Mr. Kluener, and Charlotte J. Kluener is referred to individually as Ms. Kluener). Unless otherwise noted, all section references are to the Internal Revenue Code in effect for the year in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

After concessions, the issues remaining for decision are whether petitioners are liable for: (1) Income tax on the gain realized from the sales of certain horses that Mr. Kluener transferred[2] to his wholly owned corporation prior to the sales; and (2) the accuracy-related penalty provided by section 6662(a) for a substantial understatement of income tax.

FINDINGS OF FACT

Some of the facts have been stipulated for trial pursuant to Rule 91. The parties' stipulations of fact are incorporated herein by reference and are found as facts in the instant case.

Mr. Kluener died on October 14, 1991. At the time the petition in the instant case was filed, the executors of Mr. Kluener's estate were Donald E. Hathaway (Mr. Hathaway), who

---

[1](...continued)
of deficiency. Respondent accordingly determined the deficiency and penalty in issue against his estate.

[2]     The use of the words "transfer", "receive", "receipt", "pay", and similar terms to describe the form of the transaction in issue does not indicate that we accept that the substance of that transaction accords with its form.

resided in Florida, Vincent H. Beckman, who resided in Ohio, and John W. Kreutzcamp, who resided in Indiana. Mr. Hathaway served as Mr. Kluener's financial and tax adviser prior to Mr. Kluener's death. At the time the petition in the instant case was filed, Ms. Kluener resided in Cincinnati, Ohio.

During relevant times, each of the Klueners maintained an account (agency account) with the Fifth Third Bank (Fifth Third or bank) in which the bank held securities as the account holder's agent. As of July 31, 1989, the market value of the securities held in Mr. Kluener's agency account was $5,081,394.79. As of June 30, 1989, the market value of the securities held in Ms. Kluener's agency account was $7,536,314.33. As of September 30, 1989, Mr. and Ms. Kluener each held securities in separate street accounts with Legg Mason Wood Walker, Inc. (Legg Mason), that were valued at $213,088 and $201,426, respectively.

Additionally, during 1989, Mr. Kluener owned interests in certain highly leveraged real estate ventures, to which he had advanced $12,200,000. Mr. Kluener had borrowed those funds from Fifth Third in the form of personal unsecured loans. The interest that Mr. Kluener collected from the ventures with respect to his loans to them afforded him a source of funds from which to pay the interest on his personal debts to Fifth Third. Due to changes in the tax law by the Tax Reform Act of 1986 and saturation of the real estate market, real estate values fell,

and the properties held by the ventures in which Mr. Kluener held an interest could not be sold.  During 1986 through 1989, the ability of the ventures to pay interest to Mr. Kluener deteriorated, and, during 1989, (1) the ventures were not generating sufficient cash-flow to afford him an adequate source of funds to pay the interest on his debt to Fifth Third, (2) the real estate held by the ventures could not be sold for an amount sufficient to retire their debts to Mr. Kluener, and (3) Mr. Kluener's loans to the ventures were considered worthless.

During 1989, Mr. Kluener owned stock in ALUCHEM, an aluminum-grinding company.  Also, during all times (prior to Mr. Kluener's death) relevant to the instant case, Mr. Kluener was the sole shareholder and chief executive officer of American Power Equipment Co., Inc. (APECO).  During 1989 and 1990, Mr. Kluener was also a director of APECO.  Mr. Kluener had previously been the principal executive of the Campbell Hausfeld Co. (Campbell Hausfeld), a successful manufacturer of paint-spraying equipment in which Ms. Kluener's family held an interest and which had been sold around 1971.  Although APECO had originally produced chain saws, upon the expiration of the covenant not to compete that he had signed when Campbell Hausfeld was sold, Mr. Kluener made APECO into a manufacturer of paint-spraying equipment, which was its business when the events in issue in the instant case occurred.  APECO's business activities were

conducted at a site in Harrison, Ohio, that had been acquired from Campbell Hausfeld.

APECO had a history of losses. On its Federal income tax return for its fiscal year ending June 30, 1989, it reported that a net operating loss (NOL) of $4,472,915 was available for carryover to its fiscal year ending June 30, 1990, and that NOL was carried over. During relevant times, APECO received loans from Mr. Kluener and Fifth Third to finance its operations. As of January 1, 1989, APECO owed Mr. Kluener $800,000. On or about April 19 and June 12, 1989, he made loans of $700,000 apiece to APECO using funds from his agency account to fund all or a portion of each loan. As of June 30, 1989, APECO owed Fifth Third $3,885,000, and, on or about July 31, 1989, APECO obtained a final loan of $1,500,000 from the bank, bringing its indebtedness to Fifth Third to $5,385,000. Mr. Kluener guaranteed Fifth Third's loans to APECO.

During 1989, APECO's personnel were developing a variety of new or improved products, including more durable sprayer parts, a high-volume, low-pressure spray gun, and a Do-It-Yourself paint sprayer. Mr. Kluener dictated the products that APECO's personnel were to develop. During mid-1989, a project to develop a new type of paint sprayer was just beginning and did not yet have a name. The concept on which the sprayer was based called for a new method of powering the sprayer mechanism and involved a different design than had been used previously. At a June 8,

1989, meeting of APECO's board, the concept of a "turbo airless sprayer" was discussed, but such a product was not mentioned in the minutes of subsequent board meetings on November 20, 1989, and January 16, 1990. Eventually, the sprayer developed from the concept came to be known as the "Planatronic". During mid-1989, APECO's personnel had not allocated a specific amount of money to the development of the Planatronic. APECO experienced continuing difficulties in developing the Planatronic into a reliable product that were not solved as late as July 1991.

Mr. Kluener owned 41 thoroughbred horses, and he had at one time owned as many as 120 to 125 such horses. His horse-related activities were conducted through a sole proprietorship known as Robert G. Kluener Enterprises, which maintained an office in Cincinnati. Mr. Kluener's assistant worked in that office and was responsible for a variety of administrative tasks relating to his personal and business activities, including the paperwork and check-writing connected with the horse-related activities.

As a result of the collapse of the real estate ventures, his obligations to Fifth Third, and the need to fund APECO, Mr. Kluener could no longer afford the losses generated by the horse-related activities, which, for the first 7 months of 1989, amounted to approximately $400,000. Moreover, due to declining health, Mr. Kluener did not enjoy those activities as much as he formerly had enjoyed them, and he began to lose interest in them. Accordingly, Mr. Kluener decided to sell his horses. His tax

advisers recommended that the horses be transferred to APECO and sold in its name so as to use APECO's NOL's to shelter any gain realized on their sale. Had Mr. Kluener sold the horses directly, a certain portion of any gain realized would have been taxed as ordinary income pursuant to section 1245, and the balance would have been taxed as capital gain. Consequently, the amount netted from the sale would have been substantially reduced by taxes.

On or about August 1, 1989, Mr. Kluener transferred to APECO title to his entire collection of 41 horses, with an estimated fair market value of $2,428,654. A separate division, APECO Equine, was created to handle the horse-related activities. Only Mr. Kluener, his assistant, and his tax advisers knew of the transfer when it occurred. The other directors and officers of APECO, including its president, Marvin Stock (Mr. Stock), were not informed of the transfer, and Mr. Kluener and his advisers made every effort to ensure that those others did not learn of it. Mr. Stock also was unaware of the existence of APECO Equine. The transfer was not reflected in APECO's monthly financial statements for its year ending June 30, 1990.

After the horses were transferred, Mr. Kluener's assistant continued to perform the same functions with respect to the horses as she had prior thereto, and the functions were performed at Mr. Kluener's office in Cincinnati, rather than at APECO's office in Harrison. Although Mr. Kluener's assistant was

nominally an employee of APECO both before and after the transfer, Mr. Kluener personally had reimbursed APECO for the cost of her compensation and continued to do so after the transfer.

Horses of the quality of those transferred by Mr. Kluener are generally sold at open auction, at which the animals offered for sale are displayed and bid upon. It is very unusual for sales to be effected privately. Auctions occur at certain times of the year, including the fall; to be sold at auction, a horse must be registered by a cutoff date so that it may be placed on the auction list. Between August and December 1989, 37 of the horses transferred were sold at auction, realizing net proceeds after deduction of expenses in the amount of $2,177,685, resulting in gain realized in the amount of $1,235,595. Of the remaining horses, two were sold for nominal amounts during early 1990, one died, and one was given away because it was infertile.

The sales proceeds were paid to APECO Equine beginning in October 1989. The bulk of the proceeds was paid in two checks, each in the amount of $949,400, that were received on December 21, 1989, and January 11, 1990, respectively, with the remainder being paid over several following months. The proceeds initially were deposited in a checking account in the name of APECO Equine that was maintained at Fifth Third. Only Mr. Kluener and his assistant had signature authority with respect to that account. The sales proceeds were thereafter deposited in a brokerage

account with Legg Mason in the name of APECO Equine and were invested in stocks and bonds. Only Mr. Kluener could authorize transactions, such as sales and purchases, with respect to that account.

APECO's other directors and officers, including its president, were not informed that the horses were sold in APECO's name or of the funds held in accounts in APECO Equine's name, and Mr. Kluener and his advisers made every effort to ensure that those others did not know of the manner in which the sales were effected or of the accounts. The sales were not recorded in APECO's monthly financial statements for its year ending June 30, 1990. The account in which the securities were held was maintained with Legg Mason rather than Fifth Third to keep APECO's personnel from learning of it. At a January 16, 1990, meeting of APECO's board, Mr. Kluener stated that between $1,500,000 and $2,500,000 would be required to bring APECO's new product lines to market, but that there did not appear to be any source of such an amount of capital available to the company. Suggestions as to potential sources of capital were solicited from the board. Mr. Kluener purposely did not reveal to the board the existence of the funds held in APECO Equine's name. During the time when the proceeds of the horse sales were held in its name, none of those proceeds were paid by APECO Equine to APECO.

Mr. Kluener made loans to APECO instead of using the funds held in the name of APECO Equine in order to, inter alia, keep the existence of those funds a secret from APECO personnel. Mr. Kluener made loans to APECO during the time the sales proceeds were held in the name of APECO Equine as follows:

| Approximate Date | Amount |
|---|---|
| Nov. 3, 1989 | $700,000 |
| Jan. 29, 1990 | 300,000 |

The foregoing loans were funded in whole or part by distributions from Mr. Kluener's agency account. During December 1989, APECO collected approximately $1,600,000 with respect to a disputed account receivable. On or about December 29, 1989, APECO made a distribution to Mr. Kluener in the amount of $1,437,488.90 that (1) repaid the $1,400,000 in loans that he had made on or about June 12, and November 3, 1989, and (2) paid interest to him in the amount of $37,488.90. The payment was deposited in Mr. Kluener's agency account.

On or about June 4, 1990, Mr. Kluener's personal debts to Fifth Third became due. Fifth Third refused to renew its loans to Mr. Kluener that totaled $12,200,000 and its loans to APECO that totaled $4,785,000[3] because Mr. Kluener had submitted to it a financial statement showing that his liabilities exceeded his assets by $3,856,608 as of September 30, 1989. The loans were renegotiated shortly thereafter. As part of the renegotiation,

---

[3]    APECO reduced its debt to Fifth Third from $5,385,000 to $4,785,000 by making principal payments of $400,000 and $200,000 on or about Apr. 10 and July 9, 1990, respectively.

Mr. Kluener was required to make a principal payment of $500,000 to Fifth Third, and his remaining debt of $11,700,000 was consolidated into one note that required monthly interest payments at the prime rate and principal payments of $500,000 on each of December 31, 1990, and June 30, 1991, with the balance due on September 30, 1991. APECO's debt was consolidated into one $4,785,000 note requiring monthly interest payments at the prime rate and was due on September 30, 1991. Mr. Kluener guaranteed APECO's note.

Mr. Kluener pledged the assets in his agency account to secure the renegotiated notes, and the pledge agreement provided that Mr. Kluener could not withdraw more than $100,000 of principal per year from the account without the bank's permission, except that withdrawals for the purpose of paying the bank interest or principal on his or APECO's notes were not restricted. Prior to the execution of the pledge agreement, there were no restrictions on Mr. Kluener's ability to use the assets in the agency account. Additionally, Mr. Kluener pledged his APECO stock and certain interests connected with his real estate investments to secure the notes. Pursuant to the pledge agreement, the net distributions that he received with respect to his APECO stock were also to be applied to pay his obligations to Fifth Third.

Effective June 25, 1990, Mr. Kluener, as sole shareholder of APECO, reduced the number of directors of APECO to one, and

dismissed all of the directors, except himself.  As sole director, Mr. Kluener declared, effective June 25, 1990, a distribution to himself of $2,176,000, to be paid by July 31, 1990, representing the remaining amount of the proceeds of the horse sales and the earnings thereon held in the Legg Mason account in the name of APECO Equine.  The balance of the Legg Mason account was distributed to Mr. Kluener during July 1990. APECO's president was unaware of the distribution when it occurred.  The timing of the distribution was set with the assistance of Mr. Kluener's tax advisers.  For its year ending June 30, 1990, APECO had no current or accumulated earnings and profits, and the distribution was treated as a nontaxable return of capital.

The transaction involving the horses was reflected in APECO's financial records for the first time when its audited financial statement for the year ending June 30, 1990, was prepared.  APECO's audited financial statement for its year ending June 30, 1990, describes the transaction involving the horses as follows:

> In August 1989, the Company's shareholder contributed equine property to the Company with the intent of selling the property and utilizing the Company's tax loss carryforwards to shelter the gain on the sale. The contribution to capital of this nonmonetary asset was valued at the net proceeds from the sale of the property which took place within two months of the contribution.  Such value was $2,152,288.

> In June 1990, the Company declared a distribution of $2,176,000 which was paid in July 1990.  This distribution was recorded as a reduction of additional

paid in capital.  The distribution was intended to return the 1989 capital contribution plus earnings on the invested funds to the shareholder.  The shareholder then loaned $176,000 to the Company.  The transaction also reduced the tax loss carryforward for tax purposes by $1,210,200.

APECO's audited financial statement for its year ending June 30, 1990, also stated that APECO might not be able to continue as a going concern in view of its losses, and APECO's balance sheet as of that date reflected negative shareholder's equity of $2,308,869.

The $2,176,000 that Mr. Kluener received as a distribution from APECO was used as follows:  On July 27, 1990, he repaid a $400,000 loan from Ms. Kluener; also on or about both that date and September 10, 1990, he made loans of $600,000 and $176,000, respectively, to APECO; on or about both September 10 and December 31, 1990, he made payments of $500,000 to Fifth Third to reduce his personal indebtedness.

The horse sales were reported on APECO's Federal income tax return for its taxable year ending June 30, 1990, and no tax was paid with respect to the sales because the gain realized was offset against APECO's NOL's.  The Klueners did not report the sales on their Federal income tax return for 1989.

During 1991, Mr. Kluener made loans to APECO as follows:

| Approximate Date | Amount |
| --- | --- |
| Jan. 30 | $250,000 |
| Mar. 22 | 75,000 |
| Mar. 27 | 75,000 |
| May 7 | 204,000 |
| July 29 | 400,000 |
| Sept. 23 | 400,000 |

All or a portion of the funds for the loans made on or about March 27, July 29, and September 23, 1991, were funded by distributions from Mr. Kluener's agency account.

During mid-1991, Mr. Kluener's and APECO's notes to Fifth Third were renegotiated. As part of that renegotiation, the pledges of assets made during 1990 were canceled, and a new arrangement was substituted. The Klueners signed a new promissory note to Fifth Third that was dated June 25, 1991, in the principal amount of $15,985,000 and that bore interest at the prime rate. The note provided that its principal amount would be due in full 60 days after the death of the last of them to die. By letter dated June 25, 1991, and addressed to Fifth Third, the Klueners agreed, inter alia, to maintain substantially all of their investment assets in the agency accounts in each of their names, to not substantially increase their expenditures to maintain their standard of living, and to invest no more than an additional $3 million in APECO. Prior to this time, Ms. Kluener's assets were not subject to the claims of Fifth Third arising from its loans to Mr. Kluener and APECO.

Between Mr. Kluener's death on October 14, 1991, and May 1992, his estate made additional advances to APECO totaling $1,292,000. APECO eventually was sold for $2,500,000.

OPINION

The issue to be decided in the instant case is whether APECO was the actual seller of the horses, as petitioners contend, or Mr. Kluener was the seller, as respondent contends. If we decide

that APECO is the true seller, it would be charged with the gain realized on the sale of the horses, and no tax would be due because APECO's substantial NOL carryforwards would offset that gain. Moreover, because APECO had no current or accumulated earnings and profits at the time the sales proceeds and the earnings accumulated on them were distributed to Mr. Kluener, the distribution would be treated as a nontaxable return of capital and not as a taxable dividend. If we decide that Mr. Kluener is the true seller, he would be charged with the gain on the sale of the horses, and an additional amount of income tax would be due from petitioners.

Petitioners contend that, on or about August 1, 1989, Mr. Kluener transferred title to the horses to APECO in a transaction intended to meet the requirements of section 351(a). Mr. Kluener did not negotiate or contract to sell the horses prior to the transfer, but, subsequent to the transfer, the horses were sold at auction or otherwise disposed of. The sales proceeds were paid to APECO, which reported the sales for tax purposes. Petitioners acknowledge that the form of the transaction was designed to use APECO's NOL's to shelter the gain realized on the sale of the horses but argue that the transfer was for a legitimate business purpose. According to petitioners, the purpose for the transfer of the horses was to provide APECO with a source of funds for the development of the Planatronic, and the horses were the only asset Mr. Kluener could contribute to APECO without diminishing his interest-paying capability to Fifth

Third.  They argue that the sales proceeds were not used by APECO because other sources of funds were available to it.  Petitioners further contend that there was no intention to withdraw the sales proceeds from APECO when the horses were contributed and the distribution of the sales proceeds was precipitated by events that were unforeseen at the time of the transfer.

Respondent's position is that, although the transaction was cast as a sale of the horses by APECO, the substance of the transaction was that Mr. Kluener sold the horses using APECO as a conduit and that the gain realized on the sale therefore must be charged to him.  Respondent contends that Mr. Kluener had decided to sell the horses for personal reasons prior to transferring them to APECO and that the sole purpose for transferring the horses to APECO was to use its NOL's to avoid tax on the gain realized on the sale.  Respondent maintains that Mr. Kluener kept control of the horses and the sales proceeds while they were nominally held by APECO, concealing from the other officers and directors of APECO the fact that the transaction involving the horses was conducted in the name of APECO, as well as the e xistence of the accounts in which the sales proceeds were held.  Respondent notes that the sales proceeds were never used to fund APECO's operations, which instead were financed by loans from Mr. Kluener using funds from his bank accounts.  Respondent also points to the distribution to Mr. Kluener of all of the sales proceeds and earnings held in the name of APECO several months

after the sales, which was effected after he dismissed all other directors of APECO.

Respondent relies upon a line of cases holding that, in certain circumstances, a transfer of property followed by the sale of the property by the transferee will be treated for tax purposes as a sale by the transferor, with the result that the gain realized on the sale will be charged to the transferor. Stewart v. Commissioner, 714 F.2d 977, 991-992 (9th Cir. 1983), affg. T.C. Memo. 1982-209; Hallowell v. Commissioner, 56 T.C. 600, 607-609 (1971); Palmer v. Commissioner, 44 T.C. 92, 94-96 (1965), affd. per curiam 354 F.2d 974 (1st Cir. 1965); Rollins v. Commissioner, T.C. Memo. 1993-643. The holdings of these cases are derived from the reasoning of Commissioner v. Court Holding Co., 324 U.S. 331, 334 (1945), in which the Supreme Court stated:

> The incidence of taxation depends upon the substance of a transaction. The tax consequences which arise from gains from a sale of property are not finally to be determined solely by the means employed to transfer legal title. Rather, the transaction must be viewed as a whole, and each step, from the commencement of negotiations to the consummation of the sale, is relevant. A sale by one person cannot be transformed for tax purposes into a sale by another by using the latter as a conduit through which to pass title. To permit the true nature of a transaction to be disguised by mere formalisms, which exist solely to alter tax liabilities, would seriously impair the effective administration of the tax policies of Congress. [Fn. ref. omitted.]

Petitioners contend that the foregoing cases do not govern the instant case, relying principally upon two cases holding that the form of a transaction involving a transfer of property will be respected where a legitimate business purpose for the transfer

is shown.  Smalley v. Commissioner, T.C. Memo. 1973-85; Caruth v. United States, 688 F. Supp. 1129, 1138-1142 (N.D. Tex. 1987), affd. on another issue 865 F.2d 644 (5th Cir. 1989).[4]

As we have noted, "The distinction between the two lines of cases is often shadowy, particularly in the context of a purported transfer between a closely held corporation and one or more of its shareholders."  Hallowell v. Commissioner, supra at 607.  However, it is for us to decide, upon consideration of all the circumstances, the factual category in which a particular transaction belongs.  Id.  We must resolve the question of who in substance, and not simply in form, made the sale.  Id.

For convenience, we recapitulate the facts, which are straightforward.  Mr. Kluener was the sole shareholder of APECO, its chief executive officer, and a director.  Having decided to sell his horses, on or about August 1, 1989, Mr. Kluener transferred title to the horses to APECO, and a separate division of APECO called APECO Equine was created to handle the horse-related activities.  Most of the horses were sold at auction between August and December 1989.[5]  The net proceeds derived from the sales during 1989 were $2,177,685, and the amount of gain

---

[4]    Although petitioners do not rely on United States v. Cumberland Public Service Co., 338 U.S. 451 (1950), we note that, in that case, the Supreme Court gave effect to the form of a transaction involving a transfer and sale of property where the substance of the transaction accorded with that form.

[5]    The 41 horses transferred were disposed of as follows: Thirty-seven were sold at auction during 1989; two were sold for nominal amounts during 1990; one died; and one was given away because it was infertile.

realized was $1,235,595. The gain was reported on APECO's return for the taxable year ending June 30, 1990, but, after application of its NOL's, no taxable income or tax resulted from the sales. The sales proceeds were initially deposited in a checking account with Fifth Third, and were later transferred to a brokerage account with Legg Mason. Only Mr. Kluener and his assistant had signature authority for the checking account, and only Mr. Kluener could authorize transactions on the account with Legg Mason. Mr. Kluener made every effort to keep secret from APECO's other directors[6] and officers (1) the transfer of the horses to APECO, (2) the sale of the horses in its name, (3) the receipt of the sales proceeds by APECO Equine, and (4) the existence of the accounts containing those proceeds. During the time when the sales proceeds were held in the name of APECO Equine, Mr. Kluener continued to lend money to APECO to fund its operations so as to preserve the secret. None of the sales proceeds were paid to APECO by APECO Equine. Having dismissed the other directors of APECO, Mr. Kluener, as sole director of APECO, declared a distribution to himself of $2,176,000, representing the balance of the account with Legg Mason in APECO Equine's name, that was effective as of June 25, 1990, and was to be paid by July 31,

---

[6]    Respondent contends that APECO's Board did not vote on whether to (1) accept the transfer of the horses or (2) to sell or retain them. Petitioners respond by claiming that there is no evidence in the record showing whether or not the board voted on those matters. We note that petitioners bear the burden of proof, and the absence of evidence on this score can hardly be considered to operate in their favor. Hallowell v. Commissioner, 56 T.C. 600, 608 (1971).

1990.  Because APECO had no accumulated earnings and profits, the distribution was treated as a nontaxable return of capital.

Petitioners urge a number of points in an effort to distinguish the instant case from the cases relied on by respondent.  We have considered each of petitioners' contentions and discuss certain of them below.  Petitioners' first contention is that no negotiations for the sale of the horses were undertaken prior to their transfer to APECO.  We, however, are not persuaded that the absence of prearrangement dictates the result in the instant case.  Although prearrangement of the sale of transferred property is cogent evidence that the transferee passing title is a conduit and is not in substance the seller of property, Palmer v. Commissioner, 44 T.C. at 94-96; Abbott v. Commissioner, T.C. Memo. 1964-65, affd. per curiam 342 F.2d 997 (5th Cir. 1965), where property is readily marketable, and prior arrangements are therefore superfluous, the absence of prearrangement is not decisive, Hallowell v. Commissioner, supra at 608.  In the instant case, the horses that were sold at auction during 1989[7] were readily marketable.  Moreover, it is customary for horses of the quality of those transferred by Mr. Kluener to be sold at open auction, and very unusual for a sale to be made privately.  Consequently, we conclude that the absence of prearrangement is not decisive of the issue at hand.  Id.

---

[7]    Inasmuch as it is the gain realized from the sale of 37 horses at auction during 1989 that has given rise to the present controversy, we need not consider whether the four remaining horses that were not disposed of in that manner were readily marketable.

Petitioners further rely on the fact that title to the horses was transferred to APECO prior to their sale and that APECO was not a shell corporation used merely for tax avoidance. We have considered those facts; however, in reaching our decision, we do not conclude that any particular aspect of the transactions in issue is fictitious or a sham. Rather, we view the transactions as a whole and, when the transactions are so considered, the transactions amount in substance to a sale of the horses by Mr. Kluener. Id. at 609. As the Supreme Court noted in Commissioner v. Court Holding Co., 324 U.S. at 334: "the tax consequences which arise from gains from a sale of property are not finally to be determined solely by the means employed to transfer legal title. Rather, the transaction must be viewed as a whole". Moreover, a corporation need not be a shell in order to be treated as a conduit. Bank of Am. Natl. Trust & Sav. Association v. Commissioner, 15 T.C. 544, 552-553 (1950), affd. per curiam 193 F.2d 178 (9th Cir. 1951); Gaw v. Commissioner, T.C. Memo. 1995-531. Accordingly, the circumstances to which petitioners point are not conclusive.

Additionally, petitioners, noting that we have in the past considered whether a nontax, business purpose exists for the transfer of property for purposes of identifying the actual seller of the property, contend that the transfer to APECO was supported by a business purpose; namely, providing APECO with a source of funds to develop the Planatronic. Petitioners also contend that, having decided to put additional capital into

APECO, Mr. Kluener was not obligated to use the method of doing so that would incur the most tax and that it was appropriate to use APECO's NOL's to shelter the gain realized on the sales of the horses so that the full amount of the sales proceeds would be available for APECO's purposes.

We have considered petitioners' arguments; however, after considering all of the circumstances of the instant case, we conclude that petitioners have not established that there was a legitimate business purpose, in addition to the admitted tax avoidance purpose, for the transfer of the horses to APECO. At the time that the horses were transferred, the development of the Planatronic was just beginning, and the project did not yet have a name. Although the concept of a "turbo airless sprayer" was described at a meeting of APECO's board on June 8, 1989, there is no mention of such a product in the minutes of subsequent board meetings on November 20, 1989, and January 16, 1990. During mid-1989, APECO's personnel had not allocated a specific amount of money to the development of the Planatronic. Furthermore, APECO had received a $1,500,000 loan from Fifth Third at approximately the same time as the transfer occurred. Moreover, it was Mr. Kluener's practice at all relevant times to finance APECO's operations with loans, rather than capital contributions. Mr. Hathaway, Mr. Kluener's adviser, testified that Mr. Kluener preferred to finance APECO in that manner.

Even after the sales proceeds were received, they were not used for any purpose of APECO during the time when they were held

in the name of APECO Equine.  Petitioners attempt to explain this by claiming that their use was unnecessary because APECO was breaking even with respect to its cash-flow for the year ending June 30, 1990.  Petitioners' explanation, however, does not account for the fact that during that year, APECO received a loan of $1,500,000 from Fifth Third, and Mr. Kluener advanced substantial amounts to APECO to finance its operations using funds from his agency account.  Moreover, APECO's financial condition during that year was tenuous.  Its audited financial statement for its year ending June 30, 1990, stated that APECO might not be able to continue as a going concern in view of its losses, and APECO's balance sheet as of that date reflected negative shareholder's equity of $2,308,869.

Additionally, the secrecy surrounding APECO's involvement in the sale of the horses casts doubt upon whether the horses were transferred to APECO for a legitimate business purpose.  The titling of the horses in the name of APECO, their sale in its name, and the receipt and possession of the sales proceeds were not reflected in APECO's financial records until APECO's audited financial statements for its year ending June 30, 1990, were prepared, which occurred after the proceeds had been distributed to Mr. Kluener.  Mr. Stock, APECO's president, was unaware of APECO Equine's existence, and Mr. Kluener made every effort to ensure that APECO's other personnel did not learn of APECO's involvement in the sale of the horses or of the funds held in APECO Equine's name.

We note that, at a January 16, 1990, board meeting, Mr. Kluener estimated that between $1,500,000 and $2,500,000 would be required to bring APECO's new product lines to market. He also stated that there did not appear to be any place the corporation could obtain such a quantity of capital, and he solicited suggestions for sources of capital from the board. Mr. Kluener made the foregoing statements even though he was aware that the proceeds of the horse sales were being paid to APECO Equine. Mr. Hathaway admitted at trial that, in making those statements, Mr. Kluener was engaging in a "charade". Although petitioners claim that Mr. Kluener did so in order to maintain the fiscal discipline of APECO's personnel, Mr. Kluener's misrepresentation to the board indicates to us that the proceeds of the horse sales were not intended for use by APECO.

Petitioners contend that Mr. Kluener intended the secrecy to keep APECO's personnel focused on the development of the Planatronic because they would have attempted to use the money for other projects had they known of it. Mr. Kluener, however, was an experienced businessman, the sole shareholder of APECO, its chief executive officer, and a director. According to Mr. Stock, Mr. Kluener attended meetings of APECO personnel and designated the products to be developed. Moreover, APECO's personnel were working on a variety of projects, with Mr. Kluener's apparent approval, during the time that the Planatronic was being developed, and the minutes of meetings of APECO's board during 1989 and 1990 do not indicate that the corporation's

resources were focused on promoting only one product.  We are not persuaded that, even with his health problems, Mr. Kluener did not have control over how APECO's resources were to be used without resorting to deception.  We note that Mr. Kluener did not appear concerned that he could not control the $1,500,000 that Fifth Third loaned to APECO at approximately the time of the transfer of the horses into the name of APECO.  Furthermore, Mr. Kluener appears generally to have dealt with concerns about control by funding APECO with periodic loans rather than by hiding funds.

The complete control exercised by Mr. Kluener over the horses and the accounts containing the sales proceeds also indicates to us that the proceeds of the horse sales were not intended for use by APECO.  APECO Equine's affairs were handled at Mr. Kluener's business office by himself and his assistant, and the financial and administrative affairs relating to the horses were conducted in the same manner as they had been when the horses were titled in Mr. Kluener's name.  While his assistant was nominally an APECO employee, Mr. Kluener continued to reimburse APECO for the cost of her compensation after the transfer, indicating that all of her services were performed for his, rather than APECO's, benefit.  Only Mr. Kluener and his assistant had signature authority with respect to the checking account in APECO Equine's name, and only Mr. Kluener could authorize transactions with respect to the Legg Mason account in its name.

Moreover, despite APECO's evident need for the sales proceeds, they were distributed to Mr. Kluener[8] within several months of the sales of the horses in issue. Petitioners acknowledge that the timing of the distribution was influenced by tax considerations, noting that, for its taxable year ending June 30, 1990, APECO had no current or accumulated earnings and profits, while it was expected that APECO would have earnings and profits during the following year, which would have rendered a distribution to Mr. Kluener taxable at least in part.

We have previously considered distributions made for the benefit of the transferors of property as having "overriding significance", regardless of any claimed business purpose, in deciding whether to charge taxpayers with the gain realized on the sale of the property.[9] Hallowell v. Commissioner, 56 T.C. at

---

[8]  The fact of the distribution of the funds held in the name of APECO Equine and the identity of the distributee afford a further basis for distinguishing the instant case from those relied on by petitioners. In Caruth v. United States, 688 F. Supp. 1129, 1138-1142 (N.D. Tex. 1987), affd. on another issue 865 F.2d 644 (5th Cir. 1989), the property transferred was retained by the corporation for its own business purposes and was not sold or distributed. In Smalley v. Commissioner, T.C. Memo. 1973-85, certain property transferred was sold, but the sales proceeds were, in response to pressure from outside creditors, used to reduce the corporation's debt to third-party lenders. In the instant case, however, even though APECO owed a substantial amount to Fifth Third, the funds held in the name of APECO Equine were not used to reduce APECO's debt to the bank.

[9]  We note that in Hallowell v. Commissioner, 56 T.C. at 609 n.5, we found the distribution for the benefit of the taxpayer of overriding significance even where the taxpayer attempted to show a corporate purpose for the distribution; viz, repayment of a debt of the corporation to the taxpayer. In the instant case, the distribution to Mr. Kluener was not made in the form of a loan repayment, and petitioners do not attempt to argue that the
(continued...)

609 n.5. We also note that in <u>Hallowell v. Commissioner</u>, <u>supra</u> at 607-609, we found it highly significant that the amount of distributions to the taxpayers from their controlled corporation during a year "roughly corresponded" to the gains realized on the sale during that year of stock transferred to the corporation. The instant case involves the distribution, within a year of the transfer and sale of the horses, of an amount not merely "roughly corresponding" to the gain realized on the sale of the horses, but exactly equal to the full amount of the sales proceeds and the earnings thereon held in the name of APECO Equine. Furthermore, the audited financial statement of APECO for the year ending June 30, 1990, notes that the distribution was made for the purpose of returning Mr. Kluener's earlier contribution.[10] Consequently, we feel that the grounds for attaching significance to the subsequent distribution and for holding APECO a mere conduit are at least as compelling in the instant case as in <u>Hallowell</u>.

Moreover, in distributing the funds held in APECO Equine's name, Mr. Kluener continued his policy of keeping their existence

[9](...continued)
distribution served a corporate purpose of APECO.

[10] APECO's audited financial statement for its year ending June 30, 1990, states:

> In June 1990, the Company declared a distribution of $2,176,000 which was paid in July 1990. This distribution was recorded as a reduction of additional paid in capital. The distribution was intended to return the 1989 capital contribution plus earnings on the invested funds to the shareholder. The shareholder then loaned $176,000 to the Company. * * *

secret from APECO's other personnel, dismissing all of APECO's directors besides himself before authorizing the distribution. Petitioners have suggested no reason for the dismissal of APECO's other directors, and it seems that Mr. Kluener felt it necessary to do this in order to preserve his "charade" as to the availability of funds to APECO. That Mr. Kluener did not reveal to APECO's personnel the existence of the funds held in APECO Equine's name, even when the funds were not to be used for any APECO project and the purported reason for secrecy had passed, indicates that APECO's possession of the funds was kept secret because the funds in reality were Mr. Kluener's.

Petitioners attempt to blunt the significance of the distribution of the sales proceeds to Mr. Kluener by contending that, at the time when title to the horses was transferred to APECO, there was no intention to distribute the proceeds of their sale to Mr. Kluener and that the subsequent distribution of the proceeds was prompted by circumstances unforeseen at the time that the transfer occurred; namely, the refusal in June 1990 of Fifth Third to renew APECO's loans and the need to make principal payments with respect to Mr. Kluener's personal debts to the bank.

We, however, are not persuaded that the distribution of the sales proceeds should be treated as unrelated to the other steps of the transaction in issue or that those steps were "old and cold" at the time the distribution was made. The circumstances noted above strongly suggest to us that the distribution of the

funds held in APECO Equine's name was preconceived.  Hallowell v. Commissioner, supra at 608-609.

We also are not inclined to credit petitioners' assertion that Fifth Third's refusal to renew APECO's loans during June 1990 was unexpected.  APECO was sustaining losses and was having difficulty developing the Planatronic prior to that time.  Mr. Kluener guaranteed its debt, but his financial condition was poor during 1989 and 1990, due principally to the collapse of his real estate ventures, which was one of the reasons that the decision was made to sell the horses.

Mr. Kluener's need to make payments on his debts to Fifth Third does not even explain why all funds held in APECO Equine's name were distributed because, pursuant to the renegotiation of his loans from Fifth Third, he was obligated to reduce the principal amount of his debt by at most $1,500,000, and he reduced it by only $1 million before it was again renegotiated. In fact, Mr. Kluener lent $776,000 of the amount distributed back to APECO.

Furthermore, it is difficult to justify Mr. Kluener's use of the funds that had been held in APECO Equine's name to pay down his loans to Fifth Third.  As part of the renegotiation of the loans, Fifth Third restricted Mr. Kluener's ability to withdraw funds from his agency account for purposes other than the payment of his or APECO's obligations to it.  Moreover, the net distributions that he received with respect to his APECO stock were also to be applied to pay his obligations to Fifth Third.

The funds held in APECO Equine's name were not so restricted. We are hard pressed to understand the business reason for the use of those funds to reduce Mr. Kluener's indebtedness instead of funds that generally could be used only for the purpose of loan repayment. Moreover, Mr. Kluener subsequently used funds from his agency account to finance APECO.[11] That Mr. Kluener would use funds ostensibly earmarked for financing APECO's operations to pay down his own indebtedness and then finance APECO using funds that were to be used to pay down that indebtedness indicates to us that, as respondent puts it, he viewed the accounts in which those funds were held "as merely different sections of his personal wallet."

Petitioners have also presented varying reasons for the distribution of the sales proceeds. Mr. Hathaway, on whose testimony petitioners rely to establish the reason for the distribution, has previously offered another explanation for the distribution. In an affidavit made in connection with the instant case, Mr. Hathaway states that the distribution was made to Mr. Kluener in an effort to control the sales proceeds because of the "attitude of management" that sought to use them for other projects, an attitude "had not been foreseen or expected", rather

---

[11] Petitioners contend that the record does not show the source of the funds Mr. Kluener used to make loans to APECO. However, because petitioners bear the burden of proof, the absence of evidence on the matter can hardly operate in their favor. Hallowell v. Commissioner, 56 T.C. at 608. Moreover, the records of Mr. Kluener's accounts with Fifth Third are sufficiently detailed to show that the agency account was the source of at least a portion of the funds lent to APECO.

than because of Fifth Third's refusal to renew Mr. Kluener's loans.[12] We note that, at trial, Mr. Hathaway testified that every effort was made to conceal the existence of the funds from APECO's other personnel, that Mr. Kluener simply feared that the sales proceeds might be diverted to other uses, and that the actions of the bank prompted the distribution. Furthermore, in the petition, petitioners alleged that the sales proceeds were distributed pursuant to an accord with Fifth Third, but no evidence of such an accord was presented at trial. The change in the reasons offered for the distribution lessens the weight we are inclined to give to petitioners' evidence on this point. Petitioners have not persuaded us that the distribution of the funds was not a step in a single transaction that began with the transfer of the horses into APECO's name.

In sum, when we combine the distribution for Mr. Kluener's benefit with the (1) efforts made to keep secret from APECO's other personnel its role in the events in issue, including (a) the transfer of the horses to APECO, (b) their sale in its name, (c) the receipt of the sales proceeds by APECO Equine, and (d) the distribution to Mr. Kluener of the balance of the Legg Mason account in APECO Equine's name, (2) control Mr. Kluener maintained over both the horses and the sales proceeds while they were held in APECO's or APECO Equine's name, and (3) Mr. Kluener's preference for financing APECO by means of loans, we

---

[12] Mr. Hathaway's affidavit indicates that no effort was made to keep the existence of the sales proceeds secret from APECO's personnel, while his testimony at trial is the opposite.

are compelled to the conclusion that, in substance, Mr. Kluener sold the horses using APECO as a conduit for the passage of title and receipt of the proceeds. Consequently, we hold that petitioners are liable for the tax payable on the gain realized from the sales.

Having concluded that the transaction in issue is properly viewed as a sale by Mr. Kluener using APECO as a conduit, we need not address respondent's contention that the gain from the sale of the horses should be allocated, pursuant to section 482, to Mr. Kluener in order to clearly reflect the income of both himself and APECO. We note, however, that we have previously stated that, if the conduit analysis of Commissioner v. Court Holding Co., 324 U.S. at 334, and its progeny applies to a transaction, all prerequisites for application of section 482 are likewise met. Southern Bancorporation v. Commissioner, 67 T.C. 1022, 1026 (1977).

We next consider whether petitioners are liable for the penalty provided by section 6662(a) for substantial understatement of income tax. Respondent determined that the penalty applied to the underpayment of tax resulting from the omission from Mr. and Ms. Kluener's 1989 return of the capital gain and section 1245 recapture income realized upon the sales of the horses that occurred during that year. Petitioners bear the burden of establishing error in respondent's determination. Rule 142(a).

Section 6662(a) and (b)(2) imposes an accuracy-related penalty equal to 20 percent of any portion of an underpayment that is attributable to a substantial understatement of income tax.  An underpayment is defined as the excess of the tax imposed pursuant to the Code over the amount of tax shown on the return plus amounts not shown but previously assessed, less rebates.  Sec. 6664(a).  A substantial understatement is one that exceeds the greater of 10 percent of the tax required to be shown on the taxpayer's return for the taxable year or $5,000.  Sec. 6662(d)(1)(A).  An understatement is defined as the excess of the amount of tax required to be shown on the return over the amount of tax which is shown on the return, reduced by any rebate.  Sec. 6662(d)(2)(A).  The amount of an understatement is reduced by the portion of the understatement attributable to the tax treatment of any item for which, inter alia, there is or was substantial authority for the treatment.  Sec. 6662(d)(2)(B)(i).  The substantial authority standard is objective and involves an analysis of the law and application of the law to relevant facts.  Sec. 1.6662-4(d)(2), Income Tax Regs.  Substantial authority exists for the tax treatment of an item where, considering all relevant authorities, the weight of authorities supporting the tax treatment of an item is substantial in relation to the weight of authorities supporting contrary treatment.  Antonides v. Commissioner, 91 T.C. 686, 702 (1988), affd. 893 F.2d 656 (4th Cir. 1990); sec. 1.6662-4(d)(3)(i), Income Tax Regs.  The weight accorded an authority depends on its relevance and

persuasiveness, as well as its type. Sec. 1.6662-4(d)(3)(ii), Income Tax Regs. A case having some facts in common with the tax treatment of the item in issue is not particularly relevant if it is materially distinguishable on its facts or is otherwise inapplicable. Id.

In the instant case, petitioners contend that substantial authority exists for treating APECO, rather than Mr. Kluener, as the seller of the horses. Petitioners contend that the transaction involving the horses complied with the express provisions of the relevant Code sections and that there was a business purpose for the transfer of the horses. Literal compliance with the provisions of the Code, however, is not alone sufficient to sustain the form in which a transaction is cast where the form lacks a nontax, business purpose and simply disguises the true nature of the transaction. Commissioner v. Court Holding Co., supra at 334; Gregory v. Helvering, 293 U.S. 465, 469 (1935). We have found above that petitioners have not shown that there was a nontax, business purpose for the transaction in issue. The authorities relied on by petitioners, Smalley v. Commissioner, T.C. Memo. 1973-85, and Caruth v. United States, 688 F. Supp. 1129 (N.D. Tex. 1987), are substantially distinguishable on their facts.

Accordingly, we conclude that petitioners have failed to show that there was substantial authority for the items giving rise to the understatement in issue and that the understatement is substantial. Consequently, we sustain respondent's

determination that petitioners are liable for the accuracy-related penalty for substantial understatement of income tax.

To reflect the foregoing and concessions,

<u>Decision will be entered</u>

<u>for respondent</u>.