**CARUTH CORPORATION, Plaintiff,**

**W.W. and Mable P. Caruth,
Plaintiffs–Appellees,**

v.

**UNITED STATES of America,
Defendant–Appellant.**

No. 88–1015.

United States Court of Appeals,
Fifth Circuit.

Jan. 27, 1989.

Teresa E. McLaughlin, Gary Allen, Chief, William S. Rose, Jr., Richard Farber, Asst. Attys. Gen., Appellate Section, Tax Div., Dept. of Justice, Washington, D.C., for defendant-appellant.

Vester T. Hughes, Jr., David C. Kent, Cynthia M. Ohlenforst, Jay H. Hebert, Dallas, Tex., for plaintiffs-appellees.

Before GOLDBERG, HIGGINBOTHAM, and DAVIS, Circuit Judges.

PATRICK E. HIGGINBOTHAM, Circuit Judge:

A taxpayer owns an appreciated asset. The asset's value is attributable largely to an imminent and inevitable payment of earnings. A few days before the payment is due, the taxpayer donates to charity the entire asset, with the right to any income upon it. We must decide if the inevitable payment is taxable as income to the donor. The IRS says that it is; the taxpayer says that it is not. The district court agreed with the taxpayer, reasoning that the taxpayer gave away an appreciated asset without ever himself realizing the appreciation upon it. 688 F.Supp. 1129 (N.D.Tex.1987). We affirm on the same grounds.

## I

This case is complicated, but its basic contours are easily described. The case involves the interaction between a peculiar rule and a peculiar asset. The peculiar rule is this: as the tax code stood in 1978, a taxpayer could donate an appreciated asset to charity and obtain a deduction for the full, appreciated value of the asset while never taking the appreciation into his income stream. 26 U.S.C. §§ 170(a), 170(b)(1)(C)(iv) (as amended in 1986, the Internal Revenue Code's alternative minimum tax provisions limit the ability to deduct the full value of appreciated assets. 26 U.S.C. § 57(a)(6)). Thus a donor who owns appreciated stock would do much better to give the stock to charity than he would to sell the stock and donate the proceeds. If the donor purchased his stock for $10, and it is now worth $100, the donor gets a $100 deduction by handing the stock over to charity. He has no income from this transaction, even if the charity immediately sells the stock. On the other hand, if the donor were first to sell the stock, and then donate the proceeds, he would have a $100 deduction, but he would also have $90 in income. This is a peculiar rule.

The peculiar asset is this: shares of non-voting preferred stock in a highly successful corporation, which stock is callable at $100 per share with 30 days notice, and which stock however enjoys a pro-rata right to any dividend issued by the corporation to its shareholders. The matter is complicated further because the taxpayer owning all of the preferred stock also owned a controlling interest in the voting

stock. Thus whether or not the corporation paid out a dividend was within the control of the preferred stock's owner. Like a goose that lays golden eggs only upon the command of its original owner, the preferred stock becomes considerably more valuable when "pregnant" with what soon must become income to somebody. With the declaration of a dividend, the asset appreciates suddenly, and then declines again to its par value (or below) when the dividend issues, as it must. This is a peculiar asset.

The interaction between the asset and the rule is this: the taxpayer in this case, soon after a dividend had been declared but a few days before the dividend record date, donated the preferred stock to charity. The charity held the stock on the record date, and so collected the dividend. The taxpayer claimed a charitable deduction for the enhanced value of the stock, "pregnant" with dividend. The IRS concedes the legitimacy of this deduction. But the taxpayer contends that the "pregnant" stock is an appreciated asset, and that because he gave away the appreciated value without first realizing it, he need not include the appreciation in his income stream. The IRS disagrees, contending that to the extent the asset's value is attributable to the imminent income payment, the increase in value is income chargeable to the taxpayer. The district court agreed with the taxpayer.

We, too, agree with the taxpayer. The details of our reasoning are presented below, but, again, it is possible to summarize the gist of our answer. The taxpayer has given away an appreciated asset, because he has parted with the asset as well as any income derivable from it. He has surrendered not just the golden egg but also the goose. It does not matter that the taxpayer may cause the corporation to redeem the surrendered stock—to, in effect, kill the goose—or that the taxpayer will himself determine when, if ever, the asset becomes "pregnant" with value again. That the goose's original owner may kill the goose or keep it from laying golden eggs certainly reduces the value of the goose to its new owner, but neither of these powers entitle

the original owner to more golden eggs. If the taxpayer's corporation redeems the preferred shares, the taxpayer does not himself get the shares. If, after such a redemption, the taxpayer's corporation issues another dividend, his proportionate share will be less than it would have been were the preferred shares still outstanding and in his possession. So there is nothing fictitious about the taxpayer's claim to have parted with an income-producing asset, rather than merely an asset plus income produced.

## II

The transaction contested in this case was a gift by taxpayers W.W. and Mabel Caruth to the Dallas Community Chest of preferred, non-voting stock in North Park Inn, Inc. ("North Park Incorporated"). The tax liability, if any were found, would be chargeable to both W.W. Caruth and his wife, Mabel. However, it was W.W. Caruth who transacted the business that gave rise to this litigation, and, for convenience, we will use "Caruth" to refer to both taxpayers, as well as to Mr. Caruth, in this opinion.

There is no controversy about the facts of the deal. We summarize Judge Buchmeyer's thorough description. In April 1978, Caruth owned most of the stock in North Park Incorporated. He owned 37.5 shares, or 75%, of the Class A Voting Common Stock. He owned 337.5 shares, or 75%, of the Class B Non–Voting Common Stock. Finally, he owned 1,000 shares, or 100%, of the Non–Voting Preferred Stock. The remaining shares of North Park Incorporated stock were owned by Caruth's nephews.

The rights and restrictions applicable to the preferred stock were described on the back side of the stock certificates. In relevant part, the description reads as follows:

> The preferred stock is non cumulative, and the holders of the preferred stock shall be entitled only to share pro-rata with the holders of common stock in all dividends, when and as declared and made payable by the board of directors

of the corporation. The corporation may at any time at the option of the board of directors, redeem the whole or any part of the outstanding preferred stock on any date after issuance by paying One Hundred Dollars ($100.00) for each share thereof. Notice of such election to redeem shall, not less than thirty days prior to the date upon which the stock is to be redeemed, be mailed to each holder of stock so to be redeemed at his address as it appears on the books of the corporation. . . . Stock redeemed pursuant to the provisions hereof, purchased, converted, or otherwise acquired shall not be reissued but shall be cancelled.

In 1978, Caruth also owned 100% of the shares of the Caruth Corporation, which he had started almost 40 years before and which was an active business. For some time before April of 1978, Caruth had been thinking about having North Park Incorporated declare dividends "in order to get money out of" this company. He planned to "wind down" the activities of North Park Incorporated because the manager of the North Park Inn hotel was "about to die." Caruth also wanted to buy the North Park Incorporated shares held by his two nephews, but they had refused—and he hoped he might reach agreement with the nephews if a substantial dividend were declared. On April 14, 1978, Caruth advised the Dallas Community Chest Trust Fund that he was "contemplating the gift of a substantial amount" of North Park Incorporated stock. No dividends had ever been paid by North Park before 1978. None were paid after 1978.

At the same time, Caruth was considering a "capital contribution" to the Caruth Corporation, which was having "more and more operations in Florida." Since the North Park Incorporated operations were being "wound down," that company did not need cash reserves—so Caruth knew he could make this "capital contribution" by giving North Park Incorporated stock to the Caruth Corporation and having North Park Incorporated declare a dividend.

Caruth did not get any legal advice from a tax specialist about these contemplated transactions. However, Caruth was knowledgeable about their tax consequences—he had a masters degree from Harvard and an undergraduate degree in accounting—and he was also aware of the possible, unfavorable impact of the "accumulated earnings tax" upon the capital reserves of North Park Incorporated.

Against this basic factual background the following events took place:

(i) On May 5, 1978, Caruth transferred his 337.5 shares of North Park Class B common stock (non-voting) to the Caruth Corporation.

(ii) On May 8, 1978, North Park Incorporated declared a dividend of $1,500 per share, payable on May 17, 1978 to those who were shareholders of record on May 15, 1978.

(iii) On May 9, 1978, Caruth donated his 1000 shares of North Park preferred (non-voting) to the Community Chest.

(iv) On the dividend record date, May 15, 1978, the Community Chest was the shareholder of record of the 1000 shares of preferred stock; the Caruth Corporation was the shareholder of record of the 337.5 shares of Class B common stock; and Caruth remained the shareholder of record of the 37.5 shares of Class A common stock (voting).

On May 17, 1978, the dividend payment date, North Park Incorporated paid the dividends—which had been declared on May 8, 1978—to the shareholders of record on May 15, 1978. Consequently, the Community Chest received a total dividend of $1,500,000 ($1500 per share for its 1000 shares of North Park stock), the Caruth Corporation received a total dividend of $506,250 ($1500 per share for its 337.5 shares), and W.W. Caruth received $56,250 ($1500 per share for his 37.5 shares).

Some two months later, on July 26, 1978, the Community Chest sent a letter to Caruth asking if he knew of someone who might buy the 1000 shares of non-voting preferred of North Park stock for the call price, $100 per share. Caruth had not made any agreement to repurchase this stock when it was donated to the Community Chest. However, on April 11, 1979, al-

most nine months after the Community Chest inquiry, Caruth wrote the Community Chest that, since he "didn't know of anyone else who is in the market for this stock and since the company is under my management," Caruth would repurchase the stock himself for $100,000. The 1000 shares of North Park Incorporated were transferred back to Caruth for this amount.

In the Caruth tax return for 1978, the 1000 shares of North Park Incorporated stock donated to the Community Chest were valued at $1,600,000 ($1,600 per share). The Internal Revenue Service objected, claiming that the dividend income on this stock should be attributed to Caruth because of the "assignment of income" doctrine. The IRS also took the position that the dividend income on the 337.5 shares of stock transferred to the Caruth Corporation should be attributed to Caruth, not to the corporation. The issue relating to the Caruth Corporation is not before us on appeal.

Caruth paid the deficiencies assessed by the IRS. In December, 1981, Caruth timely filed claims for refund of these amounts. These were denied, and on May 31, 1984, Caruth filed this suit for refund of the taxes paid under protest. The district court granted the relief Caruth requested. The IRS now takes a partial appeal, contesting the district court's decision only with respect to the shares donated to the Community Chest.

### III

There is no disputing that Caruth's gift to the Community Chest had tax consequences that were beneficial to him. Nor is there any disputing that he made the gift well aware of its tax consequences. But a well-effectuated desire to take advantage of tax rules is not itself a ground for tax liability. If the IRS wishes to tax Caruth upon the dividend from the preferred stock, it must identify a particular legal doctrine which supports its position. *Chisholm v. Commissioner*, 79 F.2d 14, 15 (2d Cir.) (L. Hand, J.), *cert. denied*, 296 U.S. 641, 56 S.Ct. 174, 80 L.Ed. 456 (1935) ("a man's

motive to avoid taxation will not establish his liability if the transaction does not do so without it").

■ The general rule governing taxation of dividends will not suffice. In general, dividend income is taxed to the shareholder who, on the record date, owns the stock with respect to which dividends are paid and who is entitled to receive the dividend. *Putnam's Estate v. Commissioner*, 324 U.S. 393, 399, 65 S.Ct. 811, 814, 89 L.Ed. 1023 (1945). The record date for the North Park Incorporated dividend was May 15, 1987. On that date, the Community Chest, not Caruth, owned the shares.

The government must find some exception to this general rule if it is to justify taxing Caruth. In the reasons advanced by the government, we may distinguish two doctrines: "assignment of income" and "sham transaction." In our view, neither doctrine applies to this case.

#### A. Assignment of Income

■ The assignment of income doctrine holds that one who earns income cannot escape tax upon the income by assigning it to another. "[I]f one, entitled to receive at a future date interest on a bond or compensation for services, makes a grant of it by anticipatory assignment, he realizes taxable income as if he had collected the interest or received the salary and then paid it over." *Commissioner v. P.G. Lake, Inc.*, 356 U.S. 260, 267, 78 S.Ct. 691, 695, 2 L.Ed.2d 743 (1958); *see also Lucas v. Earl*, 281 U.S. 111, 115, 50 S.Ct. 241, 241, 74 L.Ed. 731 (1930); *Helvering v. Horst*, 311 U.S. 112, 120, 61 S.Ct. 144, 148, 85 L.Ed. 75 (1940). Justice Holmes announced the doctrine by a now-famous metaphor: income tax may not be avoided through an "arrangement by which the fruits are attributed to a different tree from that on which they grew." *Lucas v. Earl*, 281 U.S. at 115, 50 S.Ct. at 241.

■ When a taxpayer gives away earnings derived from an income-producing asset, the crucial question is whether the asset itself, or merely the income from it, has been transferred. If the taxpayer

gives away the entire asset, with accrued earnings, the assignment of income doctrine does not apply. *Blair v. Commissioner*, 300 U.S. 5, 14, 57 S.Ct. 330, 334, 81 L.Ed. 465 (1937) (taxpayer's gift conveyed entire interest in income stream, and so did not fall under assignment of income doctrine); *United States v. Georgia R.R. & Banking Co.*, 348 F.2d 278, 285 (5th Cir. 1965), *cert. denied*, 382 U.S. 973, 86 S.Ct. 538, 15 L.Ed. 465 (1966). If the taxpayer carves income or a partial interest out of the asset, and retains something for himself, the doctrine applies. *P & G Lake*, 356 U.S. at 265 & n. 5, 78 S.Ct. at 694 & n. 5 (assignment of income doctrine applied because the taxpayer transferred a "short-lived … payment right carved out of" a larger interest; "[o]nly a fraction of the oil and sulphur rights were transferred, the balance being retained"). Ultimately, the question is whether the taxpayer himself ever earned income, or whether it was earned instead by the assignee. In terms of Justice Holmes' metaphor, the question is whether the fruit has been attributed to a different tree, or whether instead the entire tree has been transplanted.

On its face, the transaction contested in this case appears to transfer the entire asset. The Community Chest received the stock as well as the dividend. The charity, and not Caruth, would thus seem to be the party who earned the income.

The IRS, however, makes recourse to Justice Holmes' metaphor, and urges that we hold Caruth taxable upon the dividend because here the fruit was exceptionally ripe. Even at the level of metaphor, this argument is unpersuasive. We fail to see why the ripeness of the fruit matters, so long as the entire tree is transplanted before the fruit is harvested. *Blair*, 300 U.S. at 12–13, 57 S.Ct. at 333–34.

The IRS fares no better when we move from general metaphors to doctrinal particulars. The IRS itself distinguishes between "declaration dates" and "entitlement dates":

> When stock is sold after the declaration of a dividend and after the date as of which the seller becomes entitled to the dividend, the dividend ordinarily is income to the seller. When stock is sold between the time of declaration and the time of payment of the dividend, and the sale takes place at such time that the purchaser becomes entitled to the dividend, the dividend ordinarily is income to him.

Treas.Reg. § 1.61–9(c). When we apply this distinction between declaration and entitlement to this case, we notice that Caruth never enjoyed any legal right to the dividend from the preferred shares. This conclusion holds whether we look to state corporate law or to federal tax law. Under Texas law, today as well as at the time of the transaction, a dividend vests as of the record date, not as of the declaration date. Tex.Bus.Corp. Act art. 2.26 (Vernon 1980) (this article was amended in 1987, but the relevant provision was not changed). The Caruth transaction is for this reason distinguishable from that in *Estate of Smith v. Commissioner*, 292 F.2d 478, 479, (3rd Cir. 1961) *cert. denied*, 368 U.S. 967, 82 S.Ct. 438, 7 L.Ed.2d 395 (1962). In *Estate of Smith*, New Jersey law governed the rights of the shareholders, and the court construed New Jersey law to recognize vested rights at the declaration date for the dividend. Under federal tax law, the right to dividends vests as of the record date. Rev. Rule 82–11, 1982–1 C.B. 51, 52 ("[a] shareholder does not become entitled to a dividend for federal income tax purposes because the proper distributee cannot be determined with certainty until the record date"); *Putnam's Estate*, 324 U.S. at 396–97 & n. 3, 65 S.Ct. at 812–13 & n. 3.

The IRS nonetheless contends that the dividend in this case should be treated differently. We believe that, at bottom, the IRS mistakes the character of the asset donated. The IRS wishes to treat the asset as a mere conduit for Caruth's earnings, rather than as a source of those earnings. The essence of the IRS's theory appears to be that Caruth simply diverted some income, already his, into the preferred stock: by exercising his power over the corporation, he created a sudden alteration in the value of the stock, and then, having filled the stock with value, gave it away. The

preferred stock on this theory operates like a financial thermos bottle, carrying income but insulating it against contact with the taxpayer. If the IRS could sustain this theory, Caruth might be said to have parted with an asset plus income, rather than with an appreciated income-producing asset.

In fact, however, the preferred shares had value not because of income earned through other means, but because the shares enjoyed a right to participate in dividends issued by a successful corporation. When Caruth surrendered the shares, he surrendered with them the right to that participation. As already pointed out, if a later dividend issued, Caruth's proportionate share in the dividend would have diminished because he had given away the preferred shares. Caruth gave away the goose that laid the golden eggs, and so lost his entitlement to any later eggs the goose might lay. At the risk of mixing metaphors, the preferred stock was the tree that grew the fruit, rather than merely a crate for conveying the fruit.

The assignment of income doctrine does not apply.

### B. Sham Transaction Doctrine

The IRS also contends that the distinction between declaration date and record date is without a business purpose, and that we should therefore disregard the distinction as a sham. *See, e.g., Gregory v. Helvering*, 293 U.S. 465, 470, 55 S.Ct. 266, 268, 79 L.Ed. 596 (1935). Caruth contends that the distinction between the two dates was designed to encourage his nephews, who owned the remaining 25% of North Park Incorporated's common stock, to sell their shares to him. Caruth and his nephews had not been getting along well. Caruth thought that the corporation would run more smoothly if this squabbling were eliminated. The nephews had, however, resisted Caruth's offers to buy them out. Caruth believed that by issuing a large dividend, he could encourage the nephews to sell: selling would enable the nephews to realize capital gains income rather than ordinary income, and so reduce their own

tax liability. The lag between the declaration and record dates was designed to give the nephews an opportunity to sell. The plan failed in this respect; the nephews held their shares.

The district court made factual findings that Caruth wished to buy out his nephews' interest in North Park Incorporated, and that he believed declaration of a dividend might facilitate this objective. We review these findings pursuant to the clearly erroneous standard, and find clear support in the record. With these factual findings in place, we believe it obvious that the distinction between declaration and record date did, as Caruth contends, serve a legitimate business purpose.

Nor do either Caruth's control of North Park Incorporated, or that corporation's right to redeem the preferred shares, provide grounds for the IRS to argue that the donation of an appreciated asset was mere form, lacking in substance. The redemption power was subject to a thirty-day notice requirement. Thus Caruth was without power to interfere with the charity's disposition of the preferred shares between the donation date and the record date: there was no way in which he could "revoke" the dividend payable to the holder of the preferred shares. And, as we have already explained, Caruth's control over North Park Incorporated does not deprive the preferred shares of their status as an income-producing asset. Caruth's proportionate entitlement to the profits of the corporation diminished when he let go of the shares.

Finally, it is of no import that Caruth eventually bought back the preferred shares from the Community Chest. The district court made a factual finding that Caruth had not made any agreement to repurchase this stock at the time he donated it to the charity. This finding is well-supported in the record, and we will not disturb it.

### IV

The intricacies of tax law are justly infamous. To clarify our discussion of the

arcane concepts involved, we have resorted to several metaphors. Our holding, however, may be stated precisely and without adornment. The shares of preferred stock donated by Caruth were appreciated income-producing assets, rather than assets accompanied by income earned through other means. The dividend did not vest until the record date, which was after the donation. Moreover, Caruth donated the entire asset, rather than merely a partial interest in it. The assignment of income doctrine is therefore inapplicable. The dividend was not taxable to Caruth.

The judgment of the district court is therefore in all respects

AFFIRMED.