894 F.2d 342
 65 A.F.T.R.2d 90-588, 90-1 USTC P 50,059,
12 Employee Benefits Ca 1111
 ROBINO, INC. PENSION TRUST; Auke Bay Fish and Fruit Company
Pension Trust; Miles S. Schlosberg & Beth A.
Schlosberg; George Filler, Petitioners-Appellees,
v.
COMMISSIONER OF INTERNAL REVENUE, Respondent-Appellant.
George FILLER; Evelyn Filler, Petitioners-Appellants,
v.
COMMISSIONER OF INTERNAL REVENUE, Respondent-Appellee.
Miles S. SCHLOSBERG; Beth A. Schlosberg, Petitioners-Appellants,
v.
COMMISSIONER OF INTERNAL REVENUE, Respondent-Appellee.
 Nos. 88-7433, 88-7441 and 88-7442.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Dec. 5, 1989.
Decided Jan. 24, 1990.
 
 Darrell D. Hallett, Chicoine & Hallett, P.S., Seattle, Wash., for petitioners-appellants.
 Gary R. Allen, John A. Dudeck, Jr., Tax Div., Dept. of Justice, Washington, D.C., for respondent-appellant.
 Appeal from a Decision of the United States Tax Court.
 Before CANBY, WIGGINS and FERNANDEZ, Circuit Judges.
 WIGGINS, Circuit Judge:
 
 
 1
 Taxpayers George Filler and Miles Schlosberg[1] appeal the tax court's decision that their sale of real property to their pension trusts, which immediately resold the property to a third party for substantial gain, was in substance a sale by the individuals to the third party so that the gain to the trust should be attributed to the individuals. We have jurisdiction under I.R.C. Sec. 7482(a) (Supp. V 1987). We affirm.
 
 BACKGROUND
 
 2
 The tax court found the following facts: In March 1981, Filler and Schlosberg, as tenants in common, paid $1.45 million for real property in downtown Juneau, Alaska. They divided the property into two parcels. The developed parcel, to which they allocated $1 million of the purchase price, they leased to the Alaska Department of Fish and Game. The undeveloped parcel, to which they allocated $450,000 of the purchase price, they held.
 
 
 3
 The commercial real estate market in Juneau was volatile in 1981, partly because the state was considering moving its capital from Juneau. In Spring 1981, Charles Blomfield, a real estate developer, learned that a property owner would not renew his lease with the Alaska Department of Labor when the lease expired. Blomfield's partner persuaded the state to allow open bidding for a replacement lease. In May or early June 1981, Blomfield had his broker ask real estate agent Henry Tiffany to locate a site in Juneau on which he could construct an office building if the Department of Labor accepted his bid.
 
 
 4
 In June and July 1981, Tiffany spoke with Schlosberg several times about obtaining an option to purchase the undeveloped parcel, explaining that Blomfield planned to bid for the Department of Labor lease and that the parcel was well suited for the type of building the Department of Labor desired.
 
 
 5
 After a June 3, 1981 meeting with a tax lawyer, Schlosberg suggested to Filler that the Auke Bay Trust, a tax-exempt pension trust for which Schlosberg was the sole trustee and beneficiary, buy an option to purchase Filler's interest in the parcel while Filler and his wife set up a similar trust (the Robino Trust) to buy an identical option to purchase Schlosberg's interest. Filler and Schlosberg would each sell for $5,000 to the other's trust an option to buy his half share of the undeveloped parcel within two years for $275,000. Filler agreed. The Fillers created the Robino Trust on July 1, 1981. The Fillers and Schlosberg signed the cross-options on July 13, 1981.
 
 
 6
 Also on July 13, 1981, following discussions with Schlosberg, Tiffany delivered to Schlosberg proposed options for Alaska Coastal Real Estate to purchase the undeveloped parcel within three months. Notwithstanding that they had granted options to their trusts to buy the property during this period, Filler and Schlosberg as individuals executed the options. They agreed on an option price of approximately $1.3 million.
 
 
 7
 On September 15, 1981, Filler and Schlosberg as trustees for their respective trusts executed options to Blomfield to purchase the undeveloped parcel within two and one-half months if the Department of Labor awarded Blomfield its lease. The parties agreed on the same $1.3 million option price on which Filler, Schlosberg, and Tiffany had agreed in July 1981.
 
 
 8
 The Department of Labor did award Blomfield its lease. On October 10, 1981 Blomfield wrote to Schlosberg and Filler that he would exercise his options. On October 30, 1981, the trusts exercised their options to buy the parcel. On October 31, 1981 the trusts conveyed their interest in the parcel to Blomfield.
 
 
 9
 Filler and Schlosberg each reported taxable gains of approximately $50,000, the difference between the $275,000 price paid by his trust to exercise its cross-option and his $225,000 basis in his half interest in the parcel.
 
 
 10
 The IRS determined that the trusts were merely conduits for the individuals' sale of the parcel to Blomfield. The IRS computed each individual's taxable gain as approximately $430,000, the difference between the approximately $655,000 Blomfield paid to each trust for its half interest in the parcel and each individual taxpayer's $225,000 basis in his half interest in the parcel. The tax court upheld the IRS's positions.
 
 DISCUSSION[2]
 
 11
 The tax consequences of a transaction depend upon its substance, not its form. Commissioner v. Court Holding Co., 324 U.S. 331, 334, 65 S.Ct. 707, 708, 89 L.Ed. 981 (1945). "A sale by one person cannot be transformed for tax purposes into a sale by another by using the latter as a conduit through which to pass title." Id.
 
 
 12
 We will uphold factual findings of the tax court unless they are clearly erroneous. Moss v. Commissioner, 831 F.2d 833, 837 (9th Cir.1987). "Whether for tax purposes several acts constitute separate and distinct transactions or are integrated steps in a single transaction is a question of fact." Jacobs v. Commissioner, 224 F.2d 412, 413 (9th Cir.1955) (citing United States v. Cumberland Public Serv. Co., 338 U.S. 451, 456, 70 S.Ct. 280, 282, 94 L.Ed. 251 (1950); Commissioner v. Court Holding Co., 324 U.S. 331, 334, 65 S.Ct. 707, 708, 89 L.Ed. 981 (1945)). "It is for the trial court, upon consideration of an entire transaction, to determine the factual category in which a particular transaction belongs." Cumberland, 338 U.S. at 456, 70 S.Ct. at 282.
 
 
 13
 In this case, the tax court's finding that Filler and Schlosberg sold the undeveloped parcel to Blomfield by using their trusts as conduits is not clearly erroneous. First, there was evidence that Filler and Schlosberg sold cross-options on the undeveloped parcel to their trusts at below-market prices. For example, Filler and Schlosberg granted Alaska Coastal and Blomfield options to purchase the parcel at drastically less favorable terms than those of the trusts' options to purchase the parcel.[3]
 
 
 14
 Second, there was evidence that Filler and Schlosberg as individuals negotiated the terms of Blomfield's option to purchase the undeveloped parcel. There was evidence that Tiffany acted on Blomfield's behalf in negotiating with Filler and Schlosberg for Alaska Coastal's option on the undeveloped parcel. And there was evidence that Filler and Schlosberg as individuals granted Alaska Coastal options to buy the undeveloped parcel at virtually the same price that the trusts later granted Blomfield options to buy the parcel. See 3 B. Bittker, Federal Taxation of Income, Estates and Gifts, p 75.3.4 at 75-44 (1981) ("if the donee is expected to step into the donor's shoes and consummate a transaction previously negotiated by the donor, the donee's role is disregarded as mere camouflage and the sale is attributed to the donor").
 
 
 15
 Third, there was evidence that Filler and Schlosberg structured the transaction to avoid taxes. For example, Schlosberg devised the cross-option scheme only after consulting with a tax lawyer. And Filler and Schlosberg point to little justification other than tax avoidance for the cross-option scheme. See Court Holding, 324 U.S. at 334, 65 S.Ct. at 708 (rejecting "mere formalisms, which exist solely to alter tax liabilities"); Hallowell v. Commissioner, 56 T.C. 600, 606 (1971) (collecting cases that consider whether a transaction was tax-motivated in determining whether buyer was merely a conduit for passing title to a third party); cf. Goodman v. Commissioner, 74 T.C. 684, 699 (1980) (finding transaction effective for tax purposes where it did not alter the nature or amount of taxable income).
 
 
 16
 Fourth, as the transaction was carried out, Filler and Schlosberg at each moment retained complete control over the property. Schlosberg was the sole trustee and beneficiary of his trust while Filler and his wife were the only trustees and beneficiaries of their trust.
 
 
 17
 The cross-option agreement served as a strong disincentive to either party's acting unilaterally; the agreement let the taxpayers keep the parcel if it did not appreciate in value but shift the gain on the parcel to the trusts if it did increase in value. See United States v. Estate of Grace, 395 U.S. 316, 323-25, 89 S.Ct. 1730, 1734-36, 23 L.Ed.2d 332 (1969) (rejecting the device of reciprocal trusts because it leaves each beneficiary in the same economic position as if he had conveyed property to his own trust). Indeed, there was evidence that the taxpayers did not even treat their trusts as distinct entities and their cross-options as enforceable contracts: Only a few days after the taxpayers granted their trusts exclusive cross-options, the taxpayers acting in their own names granted Tiffany's company an option to buy the undeveloped parcel.
 
 
 18
 In their defense, taxpayers try to distinguish the particular facts of their transaction from facts reported in court decisions. The issue, however, is whether the tax court's conclusion is clearly erroneous, not whether the evidence would also have supported a different conclusion by the tax court.
 
 
 19
 Taxpayers also dispute the details of the tax court's chronology of the events in this case. Taxpayers assert that the precise sequence of events shows two distinct transactions. But we have reviewed the record and do not believe the tax court's chronology to be clearly erroneous. Furthermore, as the tax court stated on another occasion:
 
 
 20
 Where the issue is whether an individual is acting for himself or for trusts of which he is trustee, the chronological sequence of the steps taken to accomplish a preconceived objective (here, a sale) may have little to do with determining who in truth and substance made the sale....
 
 
 21
 ... Our examination must focus on the realities of the transaction rather than the refinements of legal title, the verbiage of written instruments, or the chronological order of formal events.
 
 
 22
 Malkan v. Commissioner, 54 T.C. 1305, 1312-13 (1970) (citing, inter alia, United States v. Lynch, 192 F.2d 718 (9th Cir.1951), cert. denied, 343 U.S. 934, 72 S.Ct. 770, 96 L.Ed. 1342 (1952)).
 
 
 23
 The decision of the tax court is AFFIRMED.
 
 
 
 [1]
 Taxpayers' wives are parties to this appeal primarily because the Fillers and Schlosbergs filed joint returns
 
 
 [2]
 Our resolution of the taxpayers' appeal makes consideration of the Commissioner's protective cross-appeal unnecessary
 
 
 [3]
 Taxpayers claim that the terms of their trusts' options to purchase the undeveloped parcel were reasonable. Taxpayers point to the fact that the value of the parcel was extremely speculative until the Department of Labor actually awarded Blomfield its lease. But this overlooks the distinction between the value of property and the value of an option to buy that property. The tax court could properly have found that when property has a good chance of jumping $800,000 in value in two months, the value of an option to buy that property at any time within two years at close to the current market value of the property is much higher than $10,000, the total price that the trusts paid for their options