Estate of Robert G. KLUENER, Donald E. Hathaway, Co–Executor, Charlotte J. Kluener, Petitioners–Appellants,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent–Appellee.

No. 97–1201.

United States Court of Appeals, Sixth Circuit.

Argued March 20, 1998.

Decided Sept. 9, 1998.

David E. Hathaway (argued and briefed), Beckman, Weil, Shepardson & Faller, LLC, Cincinnati, OH, for Petitioners–Appellants.

Stuart L. Brown, Internal Revenue Service, Joan I. Oppenheimer, David I. Pincus (briefed), Patricia Bowman (argued and briefed), U.S. Department of Justice, Appellate Section Tax Division, Washington, DC, for Respondent–Appellee.

Before: WELLFORD, NELSON, and SILER, Circuit Judges.

SILER, J., delivered the opinion of the court, in which NELSON, J., joined. WELLFORD, J. (pp. 640–641), delivered a separate opinion concurring in part and dissenting in part.

## OPINION

SILER, Circuit Judge.

This case involves the tax consequences of a horse sale. The petitioners are the estate of Robert Kluener and Kluener's widow, Charlotte ("the taxpayers"). In the late 1980's, Robert Kluener ("Kluener") transferred forty-one horses to his closely-held corporation, sold the horses, then transferred the proceeds back to himself tax-free. Respondent, the Commissioner of Internal Revenue ("IRS"), concluded that Kluener himself sold the horses. It issued a notice of deficiency and a penalty for substantial understatement of taxes. The Tax Court upheld the IRS. We AFFIRM the deficiency judgment and REVERSE the penalty.

## I. Background

Kluener controlled four separate lines of investment and used them to avoid taxes. This case centers around the American Power Equipment Company ("APECO"). APECO manufactures paint-spraying products in Harrison, Ohio. In 1989, APECO began to develop a series of "turbo airless sprayers" based on a new type of sprayer mechanism. APECO struggled to perfect this series for several years, and these development problems contributed to its serious financial losses. By the middle of 1989, APECO had a net operating loss ("NOL") exceeding $4.4 million and owed a bank over $5.3 million. These losses directly affected Kluener. He owned all of APECO's stock and served as its Chief Executive Officer, and he normally financed APECO through personally guaranteed loans. Kluener, therefore, was personally liable for APECO's entire debt.

Kluener's other investments were also losing money. Through his sole proprietorship, Robert G. Kluener Enterprises, Kluener owned thoroughbred horses worth about $2.5 million. During the first seven months of 1989, however, Kluener Enterprises lost about $400,000. Finally, Kluener and his wife held two related sets of investments involving their bank. They owned over $12.5 million in securities in the bank. They also owned portions of highly leveraged, interest-generating real estate ventures. They had financed the ventures by borrowing $12.2 million from the bank in personal unsecured loans and then repaying the loans using the interest generated by the ventures. Unfortunately, by 1989 real estate values had plummeted, and their loan repayments began to exceed the interest. In other words, they were losing money on real estate, on APECO, and on the horses.

To help stem the losses, Kluener decided to sell his horses. His two tax advisors, however, cautioned against a direct sale. With a direct sale, any gain would have been taxable as ordinary income or a capital gain. Instead, the advisors recommended that Kluener first transfer the horses to APECO, sell them in APECO's name, and use APECO's NOL to shelter any gain. This procedure would result in little or no tax liability. Kluener took the advice. In August 1989, he transferred the horses to APECO and created a separate division of APECO, APECO Equine, to handle them. Over the next several months, APECO Equine sold the horses at open auction for over $2.5 million, resulting in a gain of over $1.2 million. All pro-

ceeds went into the accounts of APECO Equine.

Despite the transfer and sale, APECO never used the funds in APECO Equine. APECO Equine never paid any money to APECO, and Kluener continued to finance APECO through loans. At least two reasons explain this forbearance. In part, an unexpected development reduced APECO's need for these funds. In late 1989, APECO collected $1.6 million on a disputed account receivable. This windfall allowed APECO to operate through the middle of 1990.

In addition, Kluener never gave APECO's officers and directors an opportunity to use the funds. Apart from APECO's vice-president for finance, Kluener never told them that APECO Equine contained almost $2.5 million or that APECO Equine even existed. He recorded neither the horses' transfer nor their sale in APECO's monthly financial statements. Indeed, Kluener actively disguised the existence of APECO Equine. For example, in January 1990, Kluener told APECO's Board of Directors that APECO needed between $1.5 and $2.5 million of capital, but that he knew of no funding sources. In a curious charade, he then solicited funding suggestions despite knowing that APECO Equine contained the needed capital.

Kluener's finances came to a head in the summer of 1990. On June 4, his debts to the bank came due. He owed the bank $12.2 million for the real estate loans, and he had personally guaranteed APECO's loans of almost $4.8 million. Furthermore, Kluener's financial statement showed a negative balance of over $3.8 million, mainly due to the collapsing real estate market. Given this bleak financial outlook, the bank refused to renew the loans and instead forced Kluener to renegotiate. He reluctantly agreed. Under the new terms, he agreed to pay $500,000 immediately and $1 million over the next year. The balance would become due by September 1991.

Faced with this new repayment schedule, Kluener decided to use the horse proceeds to repay the loans. Eleven months after first transferring the horses, Kluener dismissed all other APECO directors and distributed the remaining proceeds, $2,176,000, to him-

self. Kluener used $1 million to repay the bank and $400,000 to repay a loan from his wife. He loaned the remaining funds back to APECO. APECO reported the sale on its federal income tax return but offset the entire gain against its NOL. The Klueners never reported the gain and never paid any taxes on it. Kluener died in 1991, and APECO eventually was sold for $2.5 million.

After Kluener's death, the IRS concluded that Kluener, not APECO, sold the horses. As a result, it assessed the taxpayers a notice of deficiency of $284,247 and an accuracy-related penalty of $56,093 for substantial understatement of taxes. The taxpayers petitioned the Tax Court for relief. They conceded that tax concerns partially motivated the transfer, but contended that Kluener also transferred the horses for a legitimate business purpose, namely, to provide APECO with capital to develop the new sprayers.

At trial, the taxpayers relied heavily on the testimony of Kluener's two tax advisors, both certified public accountants and partners at Deloitte & Touche. Both advisors testified that Kluener first considered removing the horse proceeds in June 1990, after the bank refused to renew the loans. In other words, they asserted that Kluener originally transferred the horses to APECO for a legitimate business purpose, and that, at the time he was transferring the horses, he had no plan to remove their proceeds for personal use. The advisors stressed that they never researched or developed such a plan, and that Kluener had consulted them on all tax issues for almost forty years. Kluener himself was not a tax expert.

Despite this testimony, the Tax Court ruled in favor of the IRS. *Estate of Kluener v. Commissioner,* 72 T.C.M. (CCH) 1326 (1996). The court concluded that Kluener transferred the horses for his benefit rather than APECO's benefit. It stressed, among other factors, that APECO never used the funds in APECO Equine, that Kluener hid the funds, and that Kluener used most of the proceeds to satisfy his personal debts. With respect to the accuracy-related penalty, the court held that Kluener lacked substantial

authority for his acts. It found his legal sources materially distinguishable. *See id.*

## II. The Deficiency

The main issue on appeal is whether Kluener had a valid, non-tax business purpose for transferring the horses to APECO. If Kluener had such a purpose, the law will recognize the transfer and will deem APECO the horses' seller, thereby letting APECO shelter the gain with its NOL. On the other hand, if Kluener had no such purpose, the law will not recognize the transfer and will deem Kluener the seller, thereby forcing the taxpayers to pay personal taxes on the gain.

### A. Standard of Review

■■■ We review the Tax Court's factual findings for clear error. *Owens v. Commissioner*, 568 F.2d 1233, 1237–38 (6th Cir.1977). In a multi-step transaction, the identity of the seller is a factual finding, not a legal conclusion. *United States v. Cumberland Public Serv. Co.*, 338 U.S. 451, 456, 70 S.Ct. 280, 94 L.Ed. 251 (1950). "It is for the trial court, upon consideration of an entire transaction, to determine the factual category in which a particular transaction belongs." *Id.* Therefore, "[w]hether for tax purposes several acts constitute separate and distinct transactions or are integrated steps in a single transaction is a question of fact." *Robino, Inc. Pension Trust v. Commissioner*, 894 F.2d 342, 344 (9th Cir.1990) (citation omitted). *See also United States v. Bondurant*, 245 F.2d 265, 268 (6th Cir.1957). Here, the Tax Court concluded that Kluener sold the horses. We review this finding only for clear error.

### B. Discussion

■■■ The Internal Revenue Code assesses taxes based on economic reality. *Commissioner v. Court Holding Co.*, 324 U.S. 331, 334, 65 S.Ct. 707, 89 L.Ed. 981 (1945). In other words, the Code assesses taxes based on a transaction's true purpose, not its purely formal or ostensible purpose. *Id.* Under the "substance-over-form doctrine,"

courts view a transaction "as a whole, and each step, from the commencement of negotiations to the consummation of the sale, is relevant." *Id.* Pragmatic concerns underlie this approach: "[t]o permit the true nature of a transaction to be disguised by mere formalisms ... would seriously impair the effective administration of the tax policies of Congress." *Id.*

This focus on economic reality affects the taxation of property transfers. For example, a shareholder often transfers personal property to his closely-held corporation to provide it with capital. In return, he receives additional stock or, if he already owns the entire corporation, nothing at all. The Code will not tax such a transaction if the transfer occurred for a valid, non-tax business purpose. I.R.C. § 351(a).[1] In this situation, "there has been a mere change in the form of ownership and the taxpayer has not really 'cashed in' on the theoretical gain." *Stewart v. Commissioner*, 714 F.2d 977, 987 (9th Cir. 1983) (citation omitted). The transferred property benefits the corporation, not the shareholder. On the other hand, the Code will tax a shareholder who transfers property solely to avoid taxes. *Id.* at 992.

■■■ Nonetheless, a shareholder may intentionally structure a sale to utilize § 351. Tax avoidance is entirely legal and legitimate. Any taxpayer "may so arrange his affairs that his taxes shall be as low as possible; he is not bound to choose that pattern which will best pay the Treasury; there is not even a patriotic duty to increase one's taxes." *Helvering v. Gregory*, 69 F.2d 809, 810 (2d Cir.1934) (L.Hand, J.), *aff'd*, 293 U.S. 465, 55 S.Ct. 266, 79 L.Ed. 596 (1935). Therefore, a shareholder may use § 351 so long as some valid, non-tax business purpose partially motivated the transfer, even if tax concerns also played a major role. *Stewart*, 714 F.2d at 987.

■■■ In determining whether a valid, non-tax business purpose partially motivated a transaction, courts should examine all the facts and circumstances. *Cumberland*, 338

---

**1.** Unless otherwise indicated, all cites to the Code refer to the sections in effect for the taxable years at issue.

U.S. at 455 n. 3, 70 S.Ct. 280. A trial court may consider "motives, intent, and conduct in addition to . . . written instruments." *Id.* Two cases illustrate the intensely factual nature of this inquiry. *Compare Court Holding Co.,* 324 U.S. at 333, 65 S.Ct. 707, *with Cumberland,* 338 U.S. at 455, 70 S.Ct. 280. In *Court Holding Co.,* a corporation agreed to sell an apartment building but then backed out for tax reasons. The next day, the corporation declared a "liquidating dividend," liquidated its asset (the building), and surrendered all outstanding stock. The building was then deeded to corporation's shareholders, who immediately conveyed title to the purchasers. The trial court refused to find a non-tax business purpose. It held that the multiple steps were "mere formalities" because the corporation had never abandoned sales negotiations. The Supreme Court affirmed this factual finding. *Court Holding Co.,* 324 U.S. at 333–34, 65 S.Ct. 707.

*Cumberland,* on the other hand, found a legitimate business purpose on similar facts. In *Cumberland,* shareholders offered to sell all of their stock to a local cooperative. The cooperative countered with an offer to buy the corporation's hard assets, but the shareholders refused in order to avoid capital gains taxes. Instead, the shareholders liquidated the corporation and sold the assets to the cooperative, with favorable tax results. The trial court credited the transaction's form. *Cumberland,* 338 U.S. at 453, 70 S.Ct. 280. The court found that, unlike the facts in *Court Holding Co.,* the transaction "genuinely ended the corporation's activities," and that the corporation itself never planned the sale. *Id.* The Supreme Court, as in *Court Holding Co.,* affirmed the trial court's factual finding. *Id.* at 456, 70 S.Ct. 280.

■ While each case turns on its specific facts, in cases involving § 351 and closely-held corporations, courts consistently look to several factors to evaluate the existence of a valid, non-tax business purpose. These factors include the following: whether the transfer fulfilled its stated purpose; the extent to which the transferor, rather than the transferee, benefitted from the transfer; the extent to which the transferee needed the property; the length of time between the transfer and subsequent events; the number of such transfers; the taxpayer's expertise in tax matters; and the transactions' form. Courts also examine any explicit indicators of a taxpayer's intent, such as documents or negotiations that confirm or belie the existence of a pre-arranged plan.

In two cases, for example, these factors led courts to find no valid, non-tax business purpose. *See Stewart,* 714 F.2d at 989; *Hallowell v. Commissioner,* 56 T.C. 600, 1971 WL 2453 (1971). In *Stewart,* the taxpayer transferred securities to his corporation, ostensibly because it needed to reduce its debt. The corporation sold the securities and sheltered the gain. Despite supposedly needing capital, the corporation distributed most of the proceeds to the taxpayer. It kept a mere thirteen percent for itself. The trial court found no non-tax business purpose and refused to recognize the transfer. *Stewart* affirmed this factual finding. The court of appeals noted that the corporation kept very little of the proceeds, that no evidence showed that it needed additional capital, and that it distributed most of the proceeds for the taxpayer's personal benefit soon after selling the securities. *Stewart,* 714 F.2d at 991–92.

*Hallowell* reached a similar result. In *Hallowell,* the taxpayers transferred greatly appreciated stock to their corporation over three years. Soon after every transfer, the corporation sold the stock and distributed most of the proceeds to the taxpayers. The Tax Court disregarded the formalities and held that the taxpayers sold the stock. The court stressed that the corporation retained very little money even though it needed capital, and that it repaid the taxpayers roughly the amount earned from each sale. While there was no evidence of a formal prearranged plan, the court found this irrelevant; because an open market existed for the stock, the taxpayers could execute a plan without a formal arrangement. *Hallowell,* 56 T.C. at 607–08.

On the other hand, the same factors have led courts to find that a valid, non-tax business purpose exists. *See Caruth v. United States,* 688 F.Supp. 1129 (N.D.Tex.1987), *aff'd on another issue,* 865 F.2d 644 (5th

Cir.1989); *Smalley v. Commissioner,* 32 T.C.M. (CCH) 373 (1973). In *Caruth,* the taxpayers transferred stock in their closely-held corporation to their wholly-owned corporation. The transferee ostensibly needed additional operating funds, although an influx of capital was not "essential" to its survival. Three days after the transfer, the closely-held corporation declared a large dividend; by transferring the stock beforehand, the taxpayers avoided paying taxes on the dividend. The court found a valid business purpose for two reasons: the transferee was using substantial amounts of capital, and it stayed in business after the transfer rather than collapsing as some shell corporation. *Caruth,* 688 F.Supp. at 1141–42.

Similarly, in *Smalley,* the taxpayer transferred personal assets to his corporation and used its tax losses to shelter a gain. The taxpayer ostensibly wanted to reduce the corporation's debt in order to strengthen his bargaining position with another company. The court credited the taxpayer's purported business purpose. It noted that the taxpayer continued to negotiate with the other company after the transfer, and that the taxpayer's lender wanted the debt reduced. *Smalley, supra.*

■ Here, the Tax Court deemed Kluener, rather than APECO, the horses' seller. It found that Kluener had no valid, non-tax business purpose in transferring the horses. Most importantly, APECO never used any of the horse proceeds. Kluener alone ultimately benefitted from the transfer. He distributed the proceeds to himself less than a year after first transferring the horses. He actively hid the horses, the proceeds, and the very existence of APECO Equine from APECO's officers and directors. Furthermore, Kluener's normal business procedures indicate that he transferred the horses solely for tax reasons. Kluener normally funded APECO through loans, and the property transfer broke with his usual practice. After the transfer, Kluener continued to pay his administrative assistant for horse operations out of his personal funds, even though the assistant nominally had become an APECO employee.

While the taxpayers present some valid points, they fail to overcome the strong deference we must afford the trial court. They contend that Kluener transferred the horses so that APECO could develop the new sprayers, and that he never had a prearranged tax-avoidance plan. They point to financial records indicating that APECO needed capital. They argue that APECO would have used the proceeds but for two unexpected events, the windfall on the disputed account receivable and the bank's decision not to renew the loans. Indeed, Kluener's personal notes indicate that he decided to withdraw the proceeds only after meeting with bank officials. His tax advisors testified unequivocally that they never prearranged to withdraw the funds. They also testified that Kluener himself lacked the tax expertise to design such a plan.

Nevertheless, the Tax Court permissibly rejected these explanations. As the trier of fact, it need not have credited any of the taxpayers' witnesses, including Kluener's tax advisors. *Gold Emporium, Inc. v. Commissioner,* 910 F.2d 1374, 1379 (7th Cir.1990). For example, the court doubted the windfall explanation; APECO, with its finances admittedly teetering on collapse, could have used the proceeds despite the windfall on the account receivable. The court also doubted that Kluener withdrew the proceeds because the bank refused to renew the loans. Kluener withdrew all of the proceeds, about $2.2 million, even though he needed to reduce his debt by only $1.5 million. Moreover, the court permissibly placed little weight on the lack of a prearranged tax-avoidance plan because a market existed for the transferred property, *viz.,* thoroughbred horses.

Finally, the taxpayers dispute the significance of Kluener's deceit. They point out that APECO's financial vice-president knew about APECO Equine, and that the other board members dealt only with production, not finance. To the extent that Kluener actively deceived a few board members, the taxpayers argue that he did so in order to discipline them financially. They characterize the board members as spendthrifts who would use the proceeds to develop different products, not just the new sprayers. Again,

the court reasonably rejected this explanation. As APECO's sole shareholder and CEO, Kluener should have had little difficulty in controlling APECO's spending. For example, in contrast to this supposed concern over the horse proceeds, Kluener never· expressed concern over how APECO's board spent loans from the bank.

In short, the Tax Court must identify the seller. It decided that Kluener sold the horses, and that finding was not clearly erroneous. Therefore, we affirm the deficiency judgment.

### III. The Penalty

■■■ The Internal Revenue Code imposes a twenty percent tax on the portion of an underpayment attributable to substantial understatement of income ·taxes. I.R.C. § 6662(b)(2). This penalty deters taxpayers from playing the "audit lottery." *Caulfield v. Commissioner*, 33 F.3d 991, 994 (8th Cir. 1994). A taxpayer may reduce or eliminate this penalty by establishing that "substantial authority" supported his tax treatment of an item. I.R.C. § 6662(d)(2)(B)(i); *Norgaard v. Commissioner*, 939 F.2d· 874, 880 (9th Cir. 1991). Here, the Tax Court penalized the taxpayers $56,093 for substantial understatement of taxes. The taxpayers contest the penalty only on the ground that substantial authority supported Kluener's tax treatment.

### A. Standard of Review

The Sixth Circuit has not yet addressed the standard for reviewing substantial understatement penalties. Several circuits have addressed the standard of review in the context of § 6661(a), the predecessor to the current § 6662. *See* I.R.C. § 6661(a) (repealed 1989). These decisions conflict. The Ninth Circuit adopted *de novo* review while the Fourth Circuit chose clear error. *Compare Norgaard*, 939 F.2d at 877–78, *with Antonides v. Commissioner*, 893 F.2d 656, 660 (4th Cir.1990). *See also Little v. Commissioner*, 106 F.3d 1445, 1449 (9th Cir.1997) (following *Norgaard* ). The Fifth and Eleventh Circuits left the standard of review ambiguous. *See Streber v. Commissioner*, 138 F.3d 216, 223 (5th Cir.1998); *Osteen v. Commissioner*, 62 F.3d 356, 359 (11th Cir.

1995). None of these cases addressed § 6662.

■■■ In any event, § 6662's regulations countenance *de novo* review. "The substantial authority standard is an *objective* standard involving an analysis of the law and application of the law to relevant facts." 26 C.F.R. § 1.6662–4(d)(2) (1997) (emphasis added). In contrast, the regulations interpreting the former § 6661 do not emphasize the standard's objective nature. *Cf. id.* at § 1.6661–3(a)(2). An objective standard accompanies a legal issue, not a factual issue, with no need to defer to a lower court. *Norgaard*, 939 F.2d at 877–78. Therefore, we review *de novo* a lower court's decision regarding substantial understatement penalties. We review *de novo* its evaluation of the law and its application of the law to the relevant facts. We review its underlying factual findings only for clear error.

### B. Discussion

Substantial authority exists only if the weight of the taxpayer's authorities is substantial in relation to the contrary authorities. 26 C.F.R. § 1.6662–4(d)(3) (1997). "Substantial" means something less than a preponderance, but more than a mere reasonable basis. *Id.* at § 1.6662–4(d)(2). "Authority" includes several sources of law, such as statutes, court cases, legislative history, and regulations, although none of these is particularly relevant if "materially distinguishable" on its facts. *See id.* at § 1.6662–4(d)(3)(ii). The taxpayer's subjective belief that there is substantial authority is irrelevant. *Id.* at § 1.6662–4(d)(3)(i).

The Sixth Circuit has not yet considered two issues regarding substantial authority. We must consider the precise meaning of "substantial," and whether "authority" includes factual evidence as well as legal sources. A § 6661 case addressed both issues. *See Osteen v. Commissioner*, 62 F.3d 356, 359 (11th Cir.1995). In *Osteen*, the taxpayers consistently lost money on their horse breeding operation. The deficiency issue turned on the taxpayers' intent. The Tax Court upheld the deficiency after finding that the taxpayers never intended to earn a prof-

it, and upheld a tax penalty after finding that they lacked substantial authority for their position. On appeal, the Eleventh Circuit criticized the substantial authority standard:

> The application of a substantial authority test is confusing in a case of this kind. If the horse breeding enterprise was carried on for profit, all of the deductions ... would be allowed. There is no authority to the contrary. If the enterprise was not for profit, none of the deductions would be allowed. There is no authority to the contrary. Nobody argues, however, not even the Government, that because the taxpayers lose on the factual issue, they also must lose on what would seem to be a legal issue.

*Id.* at 359. In other words, the court criticized the substantial authority test for ignoring factual evidence. Without the facts, the taxpayers could present no authority to support their position, much less substantial authority.

The court then considered the penalty issue from both factual and legal standpoints. It held that substantial factual authority supported the taxpayers' position:

> If the Tax Court was deciding that there was no substantial authority because of the weakness of the taxpayers' evidence to establish a profit motive, we reverse because a review of the record reveals there was evidence both ways. In our judgment, under the clearly erroneous standard of review, the Tax Court would be due to be affirmed [on the deficiency] even if it had decided this case for the taxpayers. With that state of the record, there is substantial authority from a factual standpoint for the taxpayer's position. Only if there was a record upon which the Government could obtain a reversal under the clearly erroneous standard could it be argued that from an evidentiary standpoint, there was not substantial authority for the taxpayer's position.

*Id.* The court also held that substantial legal authority supported their position:

> If the Tax Court was deciding there was not substantial legal authority for the deductions, we reverse because of the plethora of cases in which the Tax Court has

found a profit motive in the horse breeding activities of taxpayers that were similar to those at hand.

*Id.* Therefore, under *Osteen*, "authority" encompasses factual evidence, particularly in a case that turns on intent; "substantial" authority exists if the taxpayers present sufficient facts to support a judgment in their favor under the clearly erroneous standard of review, looking at the case as if they had won on the deficiency. *Id. See also Streber v. Commissioner*, 138 F.3d 216, 223 (5th Cir. 1998) (in a § 6661 case that turned on the date of a gift, following *Osteen* and holding that authority includes factual evidence).

*Osteen*'s analysis applies to § 6662. Under § 6662, "authority" encompasses factual evidence as well as legal sources. Section 6662's regulations direct us to examine relevant facts: "[t]he substantial authority standard ... involv[es] an analysis of the law and application of the law to relevant facts." 26 C.F.R. § 1.6662–4(d)(2) (1997). Indeed, the regulations demand that we examine the facts: "[t]he weight of authorities is determined in light of the pertinent facts and circumstances." *Id.* at § 1.6662–4(d)(3)(i). On the other hand, another provision seems to imply that authority consists only of legal sources. After stating that "only the following are authority," the regulations list numerous legal sources of authority, but never refer to factual evidence. *Id.* at § 1.6662–4(d)(3)(iii). Nonetheless, we interpret this provision as excluding only certain types of legal sources, not any factual evidence. For example, this provision states that "authority" does not include overruled decisions or the opinions of tax advisors. In any event, to the extent that the regulations may conflict, we reconcile them by noting that two provisions command us to examine relevant facts, whereas nothing explicitly precludes us from examining them.

Moreover, policy concerns indicate that "authority" should include factual evidence. In this case, for example, to ignore the facts is to assess a penalty. *Cf. Osteen, supra.* Nothing in the regulations supports such a result. Finally, practical jurisprudential factors force courts to examine the facts. A court must examine the facts to evaluate a

legal source's relevance. In this sense, a legal source can constitute substantial authority only if its facts resemble those in the current case.

 We disagree, however, with *Osteen*'s analysis of "substantial." Under the regulations, "substantial" means more than a reasonable basis. 26 C.F.R. § 1.6662–4(d)(2) (1997). Therefore, "substantial authority" requires a taxpayer to present considerable or ample authority, whereas *Osteen* requires him to present only some evidence. *See Streber v. Commissioner*, 138 F.3d 216, 228 (5th Cir.1998) (King, J., dissenting).[2]

Here, the Tax Court found that substantial authority did not support Kluener's position. The court did not examine the factual evidence. In a footnote, it distinguished the taxpayers' legal authority, *Caruth* and *Smalley*, on the ground that the corporations in those cases used the transferred proceeds, whereas APECO never used the proceeds. This cursory footnote represented the court's entire discussion of an issue that cost the taxpayers $56,093. *Cf. Osteen*, 62 F.3d at 359 (criticizing the Tax Court for failing to discuss the penalty at length).

 We hold that substantial authority supported Kluener's tax treatment of the horse proceeds. Considerable factual evidence indicates that he transferred the horses for a valid, non-tax business purpose. This evidence includes his reference notes, the lack of prior research, his lack of tax expertise, and APECO's genuine need for funds. This evidence is substantial in relation to the contrary evidence. There are two very strong contrary facts: APECO never used the proceeds, and Kluener actively hid APECO Equine. Neither of these facts, alone or combined with others, overwhelms the taxpayers' evidence. The two unexpected financial developments explain, at least in part, APECO's forbearance. Similarly, Kluener's deceit does not necessarily mean

that he never intended to benefit APECO. As APECO's sole shareholder and CEO, Kluener could have controlled the proceeds without deceiving anyone. The taxpayers argue that he wanted APECO personnel to focus on the new sprayers; in light of his total control, this rationale carries at least some weight.

With this factual background, substantial legal authority supported Kluener's tax treatment. In this type of case, the distinctions between valid and invalid transfers are "shadowy and artificial." *E.g., United States v. Cumberland Public Serv. Co.*, 338 U.S. 451, 454–55, 70 S.Ct. 280, 94 L.Ed. 251 (1950). *Cf. Norgaard*, 939 F.2d at 880–81. Several cases support Kluener's tax treatment. In both *Caruth* and *Smalley*, for example, a shareholder transferred property to improve the finances of a legitimate corporation, not a shell. *See Caruth v. United States*, 688 F.Supp. 1129 (N.D.Tex.1987), *aff'd on another issue*, 865 F.2d 644 (5th Cir.1989); *Smalley v. Commissioner*, 32 T.C.M. (CCH) 373 (1973). In neither case was the transfer essential, and in neither case did the transferee use the funds immediately. Although those transferees ultimately used the funds, those taxpayers never faced an unexpected financial squeeze. As a result, when Kluener prepared his tax returns, *Caruth* and *Smalley* provided substantial authority supporting his tax treatment.

Moreover, the contrary legal authority does not overwhelm these cases. While the IRS relies heavily on *Stewart* and *Hallowell*, both cases differ in important respects. *See Stewart v. Commissioner*, 714 F.2d 977 (9th Cir.1983); *Hallowell v. Commissioner*, 56 T.C. 600, 1971 WL 2453 (1971). In *Stewart*, no evidence indicated that the transferee needed funds, and in *Hallowell*, the taxpayers repeatedly transferred property over a three-year period. Neither case involved unexpected events. Because of these distinc-

---

2. In appeals from administrative bodies, courts review factual findings under a "substantial evidence" test. *See Allentown Mack Sales and Serv., Inc. v. NLRB*, —— U.S. ——, ——, 118 S.Ct. 818, 828, 139 L.Ed.2d 797 (1998). In that context, substantial evidence is the degree of evidence that could satisfy a reasonable factfinder. While

"substantial" may mean slightly different things in each context, this formula comports with the text of the regulations and offers a familiar framework. We need not define "substantial" precisely, however, because we would reverse under any of these formulas.

tions; and considering all the relevant facts, *Caruth* and *Smalley* represent substantial authority in relation to *Stewart* and *Hallowell.* Therefore, we reverse the imposition of an accuracy-related penalty.[3]

AFFIRMED in part, REVERSED in part.

WELLFORD, Circuit Judge, concurring in part and dissenting in part.

I concur with my colleagues in affirming the Tax Court with respect to the deficiency judgment of $284,247 against the estate of Robert G. Kluener set out in Parts I and II of the majority opinion. I respectfully dissent, however, from the majority's decision to reverse the penalty against the estate and, therefore, express my disagreement with Part III of the opinion.

First, I believe that the appellants have come perilously close to waiving their challenge to the penalty assessed in this case by failing to cite any compelling authority to support their position except regulatory language. In their 45–page brief, the appellants devoted only two paragraphs to their argument on the penalty question. They claim that the imposition of the penalty "strains credulity," because "the IRS had absolutely no authority to assess such a penalty." To support that argument, they cite to the regulations which suggest that there may be more that one position with respect to the same issue, and that "substantial authority" does not mean "predominant authority." *See* 26 C.F.R. § 1.6662–4(d)(3)(i). However, the appellants never identify any conflicting positions on the issues involved, and counsel for the appellants did not discuss the propriety of the penalty assessed at oral argument. Rather, all of counsel's energies challenged the propriety of the deficiency itself. It seems that the appellants have rested their argument regarding the penalty on the outcome of the underlying deficiency issue. Under these circumstances, it seems that the appellants may have waived their challenge to the penalty in light of the fact that the deficiency assessment has been upheld.

Even if the appellants did not waive this issue, however, I would affirm the penalty as assessed by the Tax Court. It appears to this writer that the same standard of review should be applied to a penalty for negligent failure to report as for substantial understatement of tax under 26 U.S.C. § 6661 or § 6662. Without an in-depth analysis of this issue, the court in *Norgaard v. Commissioner*, 939 F.2d 874 (9th Cir.1991), simply stated that "[d]e novo review is proper because the existence of 'substantial authority' is a legal question." *Id.* at 878. The *Norgaard* court went on to hold that " '[s]ubstantial authority' is ... stricter than a reasonable basis standard." *Id.* at 880. The court explained that "a taxpayer's position with respect to the tax treatment of an item that is arguable but fairly unlikely to prevail in court would satisfy a reasonable basis standard but *not the substantial authority standard.*" *Id.* (emphasis added). The majority in this case apparently approved of that standard of review, and concluded that we should "review *de novo* [a lower court's] evaluation of the law and its application of the law to the relevant facts. We review its underlying factual findings only for clear error."

I would affirm the Tax Court's assessment of the penalty in this case under the standard endorsed by the majority. The appellants argue that "substantial authority" existed to support their tax treatment of the horse sales. The legal authority upon which the appellants rely is the same as that relied upon to challenge the deficiency itself. The appellants cite cases which hold "that funding of corporate operations [is] a valid business purpose." I do not disagree with this legal premise. The appellants' argument, however, presupposes that Kluener in fact transferred the proceeds of the horses to APECO to fund corporate operations. We

---

**3.** Surprisingly, the taxpayers never cite I.R.C. § 6664. Section 6664 precludes penalties under § 6662 if the taxpayer establishes that he underpaid in good faith and based on reasonable cause. *Richardson v. Commissioner*, 125 F.3d 551, 554 (7th Cir.1997). *See also Betson v. Commissioner*, 802 F.2d 365, 372 (9th Cir.1986); 26

C.F.R. § 1.6664–4, ex. 1 (1997). In *Betson*, for example, the court reversed tax penalties because the taxpayer acted in good faith and in reliance on tax advisors, even though the trial court did not believe his motives. In any event, we need not address § 6664.

have unanimously found that Kluener had no valid business purpose in the transfer of the horses. In essence, the appellants' entire argument regarding the penalty is a factual one, and it must rise or fall depending on the disposition of the deficiency issue. Because the absence of a valid business purpose undermines the appellants' legal arguments, the argument that "substantial authority" existed for their tax treatment of the horses must fail.

The appellants boldly assert that "it is the policy of the Internal Revenue Service to assess penalties in virtually every situation ... in the hopes of setting up straw men to use as the basis under which to extract some settlement from a taxpayer." Appellants do not, however, suggest that the assessment of the penalty in this case was merely a "bargaining chip" which the government intended to use against the estate. Conspicuously, they cite no cases to support their argument that the use of the penalty in this case was inappropriate.

Thus, I would find that the Tax Court was not clearly erroneous in its factual findings and was not incorrect in its legal conclusion that the penalty at issue was appropriate. Accordingly, I dissent on that issue and would **AFFIRM** the Tax Court in its decision on all issues in this appeal.